## PORT CITY CO. v. PECK et ux.

### No. 2104.

Court of Civil Appeals of Texas. Beaumont. Sept. 24, 1931.

Lewis Wood, Kenneth Krahl, and Hill & Harvey, all of Houston, for appellant.

Ward & Ward, of Houston, for appellees.

WALKER, J.

This was an action in trespass to try title by appellant against appellees. Among other defenses, appellees pleaded ten-year limitation. This issue was found in their favor by the verdict of the jury, and judgment accordingly entered for the land. The tract of land in issue was within appellees' inclosure of 125 acres. On this 125 acres was located the home of appellees; that is, the improvements constituting the home. A fence was built around the house in which they lived, but outside of the fence was their well, outhouses, and barns. The fence around the dwelling house can be properly described as an interior fence. All of the 125 acres outside of the interior fence was used by appellees as a pasture, and it was their contention upon the

trial of the case that it was continuously so used from 1917 until the filing of this suit in 1928, and that during all of that time appellees asserted openly and notoriously a hostile claim of title and ownership of the land in controversy.

It is the contention of appellant that the verdict of the jury is wholly without support in the evidence. The following excerpts from the testimony fully support the verdict:

Appellee G. R. Peck testified:

"That particular tract of land to which Mr. Ward directed my attention is enclosed and has been enclosed since March 10th, 1910. The fence has been constantly there since March 10th, 1910. This land is enclosed by a wire fence. There is about one hundred twenty-five acres within the tract of land that is enclosed.

"No one but me uses that one hundred twenty-five acres for any purpose. I cut hay on it, run cattle on it, and pasture on it, cattle pasture and hay pasture. I began about the fall of 1910 to use it for the purpose of cutting hay, running cattle and pasturing on it.

"I remember the date of the judgment in 1917, it being somewhere along about the 6th of July, I believe; 1917, something like that. Since the date of that judgment I have lived on that land and pastured it continuously. Nobody has taken the place away or anything. I always considered it my own piece of land. I cut hay on it, ran dairy cattle on it; it is part of my front yard. I can turn a cow out at my house and she can go right back on this piece of land. That condition has been continuous from the date of the judgment in 1917, and before, on up to the date this suit was filed. I have been using this land, constantly, every day, all the time from the date of the judgment up until the time this suit was filed.

"It is enclosed with a wire fence around it. I turn my dairy cows out; milk them in the morning and in the evening. I go out on this piece of land and drive them up to the barn and milk them. I have been cutting hay there. I will tell you what I have got on the one hundred twenty-five acres. In 1910 I fenced it; I didn't have anything but a fence. I pastured it and cut hay on it, but I didn't live there, but in the fall of 1913 I went up there and built a house and lived there. I have lived there continuously since 1913, used it every day since 1910.

"The improvements on the one hundred twenty acres is a seven-room house, two barns, artesian well, chicken house, delco light, house, and garage.

"I just have a little fence around my yard, you see, to keep stock away from the house, and then I have got a big fence that goes around the one hundred twenty-five acres. There is no fence around my barn segregating it from the one hundred twenty-five acres.

You can turn a cow out and she can go right on over this piece of land. It is my pasture. This one hundred twenty-five acres is enclosed with a fence around the whole thing. Turn a cow out and she can go right on this piece of land.

"My one hundred twenty-five acres are right here (indicating on map). It lies in this shape. Here is the land they are suing for right over here, begins at that land. Here is my house. When you turn cattle out they go right back on this piece of land."

" * * * There is nothing intervening between my barns here and the twenty-four acres up here that is in controversy.

"My fence lines run around and outside the exteriors that I have marked A, B, C, D, and E.

"Since the date of that judgment in 1917 there has not been any time that my fences were not up around this tract of land; they have been there constantly.

"We will say this about the fence; the fence will get in bad condition; maybe I will let it run a couple of years and fix it up. I won't fix it up every year. I will go out and repair it every couple of years. I will let it alone as long as it will stand and then I will rebuild it. That fence has been used continuously during that period of time for keeping my cattle in and keeping other people's cattle out.

"From the time of the judgment up until the time this suit was filed I always claimed that land. I never recognized it any other way than as my piece of land. Nobody said anything to me about it, or came around or anything. I kept the fence up on it, I always claimed it as my piece of land. During that time I have not recognized anybody else's adverse claim to that piece of land. I haven't paid them any mind. During that time nobody has disputed my claim to the land.

" * * * I knew that that judgment rendered in 1917 destroyed or took away from me every right and title to that land. I never conceived the idea of claiming that land by limitation after that date. I knew they never took it away from me, in my mind. I always claimed it; they hadn't moved me off of the land. I was going to wait until they did it. I have always conceived it was mine. They haven't taken it away from me yet. I always claimed the land. I had it in my possession. I never gave it up. My fence was still there.

" * * * There was not any time from the date of the judgment in 1917 up until the time this suit was filed that I did not have horses on the land, inside of my enclosure. I always had them there, four or five, and a pair of mules in there continually. I had to have my saddle horse and mules anyway around there. I got as many as I could in there, because they were trying to starve

them to death for water, because if I could get them on my place for water they were all right. I got as many as I could in there. They headed me off on some of them and I couldn't get them in there. I continuously grazed the land in that enclosure, the one hundred twenty-five acres, during that time with my horses and mules. I have always made claim to it from the date of the judgment in 1917 up until the time this suit was filed. I lived on it; it is my home. I got a well on it, my home where I stayed. I had my milk cows running in there.

"From the time of the judgment in 1917 up until the time the suit was filed there never was a time during that time when my wife or I was not on the one hundred twenty-five acre tract of land. We have continually lived there. That is my home. We continuously lived there."

The witness J. E. Smith testified:

"I knew about Mr. Peck having saddle horses. He had saddle horses at all times. He always had milk cows, one or two I know except when they were killed out.

"There has been no change in Mr. Peck's fence line on the east and north from December 17, 1917 up until August 10, 1928—not on his outside line. A fence has been maintained there during that time. It is there now and was on the 10th of August, 1928. Those fences between him and the interurban, that open country, has been there since 1910. There was a new fence put on the west, we call it the Scott line.

"There is nothing intervening between Mr. Peck's barns and garage and his north and north-east line,—no fences in there. His buildings are all in one outside inclosure. His cattle and horses could go all over his enclosure from the barns without crossing any fence."

W. F. Reuge testified:

"No one other than Mr. Peck has been using the land that he now has in his enclosure or had under his enclosure August, 1928. Mr. Peck was using it. He cut hay off of it, used it for a pasture, kept his saddle horses in there, and kept his cows in there all the time. There was not a time from the time I first became acquainted with it, or from December 17, 1917, until August 10, 1928, when Mr. Peck did not have some horses or cows within that enclosure.

"I know where Mr. Peck's house is. And I know where his barns and garages are, that are on the land that he had enclosed on August 10, 1928. There is no fence between the north and east line and the barns and the garage. His cattle and horses that he had in his barn or barns would have ranged all over the acres that he has enclosed, except the fenced part around his house where he lived and slept. They ranged all over it. I know where his fence lines were in August, 1928.

They were the same on the north and east during the period back to December 17, 1917. I know where his other fence lines were during that time, on the other sides of his property that he had enclosed. During that period of time his fences were kept. They were always kept up, I am sure.

"* * * My testimony is that from 1917 up until August, 1928, Mr. Peck continuously had horses and cows in this enclosure. * * * He kept as many as thirty or forty head of cattle in there the entire year around. He generally had three or four saddle horses in there and his work horses and mules. He generally had six or eight head of horses and mules in there. Part of the time after he bought his range horses he turned some of them in there."

The witness Early Plumley testified, describing appellees' occupancy of the land in controversy:

"He has always had cattle in there—cattle and horses. I don't know about the foot and mouth disease. I don't know whether he had them in there then or not. I think they took them away from him, but he has always had horses in there. I don't know whether he had cattle in there during the foot and mouth disease or not.

"* * * He must have had twenty-five or thirty head of horses in this enclosure in the year 1924. They were all around his house, I couldn't help but see them. They were in there always. I saw them in the Spring. I saw them in the Summer. I saw them in the Fall.

"I don't know how many head of horses I saw in there in 1926. I knew he has always had horses in there. I don't remember just how many head he had in there."

Mrs. Alice Peck testified: "I know where the fence lines of the enclosure constituting the home place have been during the time we have been there. * * * The north and east fences have remained the same during that period of time. The tract of land enclosed on the north and east has been the same during that entire time. During the time I have been there up until August 10, 1928, the date of the filing of this suit, we have used the land that is within that enclosure all the time. We made hay on it, we had cattle in there and horses in there all the time. That was continuous from the time I went there up until August 10, 1928. There was not a time during that period of time that we did not have horses pastured in that enclosure. There was no time during that period of time that we did not have cattle pastured in there except during the time when we had the foot and mouth disease. We had cattle in there all the time except when we couldn't have them during the foot and mouth disease."

██ The quoted testimony fully sustains the verdict of the jury.

In Johnson v. Sullivan (Tex. Civ. App.) 163 S. W. 1015, 1016, it was said: "It was immaterial that the lot was not separately inclosed, since there was a general inclosure, even though other lots were embraced therein. Smith v. Kenney [Tex. Civ. App.] 54 S. W. 801; Cunningham v. Mathews [Tex. Civ. App.] 57 S. W. 1115."

In Moran v. Moseley (Tex. Civ. App.) 164 S. W. 1093, 1094, the court said: "It is not necessary, as contended by appellant, that the land be separately inclosed, but it is sufficient if it is with a general inclosure, even though other tracts are included therein. See Smith v. Kenney [Tex. Civ. App.] 54 S. W. 801; Cunningham v. Mathews [Tex. Civ. App.] 57 S. W. 1115."

As to the sufficiency of the occupancy to sustain the verdict, the court, in Randolph v. Lewis (Tex. Civ. App.) 163 S. W. 647, 649. said: "The evidence showed that the appellee, immediately after purchasing the land, placed his deed upon record, inclosed the land, and had continuously used it for a period of more than five years as a pasture for cattle, hogs, and goats, paying taxes thereon. Such user is sufficient to show adverse possession. See Hooper v. Acuff [Tex. Civ. App.] 159 S. W. 934. Pasturing cattle on land inclosed for that purpose, and which is under the exclusive control of the party claiming under the statute, is such use and enjoyment as is sufficient. Hardy Oil Co. v. Burnham [58 Tex. Civ. App. 285] 124 S. W. 221."

The judgment of the lower court is in all things affirmed.

Affirmed.