## J. F. B. Heard et al. v. Town of Refugio.

No. 7169.  Decided March 24, 1937.
Rehearing overruled May 5, 1937.
(103 S. W., 2d Series, 728.)

Kendall & Lawler, of Houston, *Swearingen & Miller,* of San Antonio, and *J. Turner Vance,* of Refugio, for plaintiffs in error.

The Act of 1837 (Art. 5302, R. S. 1925) applies only to conveyances from the sovereignty, and has no application to subsequent conveyances of property, title to which had passed from the sovereignty prior to the act. Galveston v. Menard, 23 Texas 349; Dittmar v. Dignowity, 78 Texas 27, 14 S. W. 269; Muller v. Landa, 31 Texas 265.

*Terrell, Davis, Hall & Clemens,* and *John W. Gaines,* all of San Antonio, for defendant in error.

On counter propositions cite: State v. Grubstake Inv. Assn., 117 Texas 53, 297 S. W. 202; City of Austin v. Hall, 93 Texas 597, 57 S. W. 563; Lewis v. City of San Antonio, 7 Texas 288.

*William McCraw,* Attorney General, *H. Grady Chandler* and *Russell Rentfro,* Assistants Attorney General, filed brief as amici curiae.

MR. PRESIDING JUDGE SMEDLEY, of the Commission of Appeals, delivered the opinion for the Court.

Defendant in error, the Town of Refugio, sued plaintiffs in error for the title and possession of 43.9 acres of land within the bounds of the four leagues granted by Coahuila and Texas

to the town and upon which the townsite is situated. The area involved in the suit, except a tract of 5.28 acres, is a part of the bed of Mission River which runs nearly through the center of the four league grant, crossing its west and south lines. The boundaries of the river bed area were disputed, but it became unnecessary for the trial court to fix the boundaries, its judgment (except as to a tract adjudged to the plaintiff on the defendants' disclaimer) being that the plaintiff take nothing by its suit. The Court of Civil Appeals affirmed the trial court's judgment as to the 5.28 acre tract, reversed it as to the remainder of the land, and rendered judgment in favor of the Town of Refugio for the title and possession of all of the land for which it sued except the 5.28 acre tract. 95 S. W. (2d) 1008. Since the Town of Refugio filed no application for writ of error, the question to be determined here is the ownership of the river bed area. In granting the application for writ of error the tentative opinion was expressed that the title to the river bed is in the State.

The Court of Civil Appeals assumed for the purpose of the appeal that the Town of Refugio acquired the fee simple title to the river bed and considered and decided as the controlling issue in the case the question whether deeds executed by the town to certain farm lots on the river had the effect of conveying the bed of the stream. In our opinion it is necessary to determine whether the sovereign has ever parted with its title to the river bed area in controversy, for, if it has not, the title to that area should not be adjudged either to plaintiffs in error or to defendant in error.

The evidence offered on the trial to show the origin and nature of the title of the Town of Refugio to the four leagues of land consisted of a copy of the opinion of the Supreme Court in the case of the Town of Refugio v. Byrne, 25 Texas 193, and a copy of an Act of the Republic of Texas approved February 1, 1842, (2 Gammel's Laws, p. 758). The opinion in the Byrne case states that the following facts were proven in the trial of that case: In the year 1830 James Power, one of the empresarios of Power and Hewitson's colony, petitioned the executive department of Coahuila and Texas for permission to found a town out of the four hundred families of which his colony at the mission of Refugio was to be composed, in conformity with the 35th Article of the Colonization Law. (Decree No. 16, Laws and Decrees of Coahuila and Texas, being the Colonization Law of March 24, 1825, 1 Gammel's Laws, pp. 125-133). The executive, in the year 1831, authorized the founding of the town, and in the year 1834 four leagues

were surveyed for the town in the form of a square, making the public square the center, the lines of the survey being described by natural objects and by certain artificial land marks. Lots in the town were surveyed and titles were executed by Vidaurri, commissioner of the colony. During the same year the town was organized as a colonial town. There was no formal grant or paper title from the government to the four leagues.

The first section of the Act of the Republic approved February 1, 1842, declared the citizens of the Town of Refugio to be a body politic and corporate and provided that the town "may hold and dispose of real and personal estate in said town." The second section extended the provisions of the charter of the town of Victoria to the Town of Refugio. By the third section of the Act the Commissioner of the Land Office was authorized and required to issue to the mayor and aldermen, and their successors in office, of the Town of Refugio, a patent "for the four leagues of land known as the tract of the Mission of Refugio, and on which said town now stands." Patent was never issued.

Plaintiffs in error in proof of their titles introduced on the trial deeds conveying farm lots adjoining, and on both sides of, the river. These deeds, executed in the name of the town by the mayor and secretary, were made in the years 1848, 1850, 1851 and 1852. They described the land conveyed by farm lot numbers and made reference to a survey or plat made by George Lyons. Proof was made that no map or plat by George Lyons can now be found among the records of the Town of Refugio. A map of the town tract made by E. S. Winsor, dated August 29, 1878, and formally approved and adopted by the town council, was admitted in evidence and accompanies the record. It shows the Mission River crossing the four league tract from the northwest to the southeast, the town proper subdivided into lots and blocks, a commons north of the town proper and the remainder of the grant divided into farm lots or tracts of various sizes. The farm lots and other lots nearest the river do not cross the river but are so platted as to have it for boundary.

1 About ten miles below the town the river empties into a bay, which is an arm of the Gulf. The trial court found that the river, except in times of drought, has a surface flow which, however, is normally of small volume, being of a depth varying from ankle deep to two feet, and that the average width of the bed of the stream from its mouth up to and including the area in controversy is thirty feet or more measured from the foot of the banks at the top of the water in its ordinary stage.

These findings are supported by the evidence. The county surveyor and another witness testified without contradiction that the width of the stream between the cut banks is more than thirty feet. According to undisputed evidence in the record the river has well defined bed and banks, both cut banks near the water and high banks, the average width of the river bed area between the high banks being from 150 to 275 feet. It is further shown by undisputed evidence that the river is normally a flowing stream, but that sometimes following a prolonged drought of from six to nine weeks it ceases to flow and stands in holes. Mission River, while not navigable in fact, is undoubtedly a perennial river and a navigable stream as defined by Article 5302 of the Revised Civil Statutes of 1925, the Act of 1837. State of Texas v. Bradford, 121 Texas 515, 531, 50 S. W. (2d) 1065; Motl v. Boyd, 116 Texas 82, 286 S. W. 458; Humphreys-Mexia Co. v. Arseneaux, 116 Texas 603, 297 S. W. 225; Hoefs v. Short, 114 Texas 501, 273 S. W. 785, 40 A. L. R. 833.

**2** The title of the Town of Refugio to the four leagues of land had its origin in a compliance with the terms and provisions of the Colonization Law of Coahuila and Texas, the Act of March 24, 1825. It was held in Town of Refugio v. Byrne, 25 Texas 193, that when the town was established in the manner prescribed and a municipal corporation organized "the law operated a dedication, reservation or grant of the lands which appertained to it, for the purposes of its foundation," that no formal grant to the town was contemplated and that none other was necessary than that contained in the law. It was further held that the confirmation of the original title by the Republic of Texas in the Act of 1842 related back to the inception of the title under the prior government. ·

While the title acquired by the Town of Refugio under the colonization law may have been merely an incipient or equitable title, as is suggested in Town of Refugio v. Byrne, or may have been subject to the control and disposition of the sovereign (Dittmar v. Dignowity, 78 Texas 22, 14 S. W. 268; Pence v. Cobb, 155 S. W. 608, 610), the nature of the original title is made unimportant by the act of confirmation. That act, by authorizing and requiring the Commissioner of the Land Office to issue to the mayor and aldermen of the town and their successors a patent for the four leagues of land, had the effect of vesting in the town as a corporation the legal title and absolute ownership of all of the land (and no more) that was dedicated, reserved or granted to the town by the

Colonization Law. Town of Refugio v. Strauch, (Com. App.) 29 S. W. (2d) 1041.

3   Did the title to that portion of the bed of the Mission River which lies within the outer boundaries of the four leagues of land surveyed for the town in the year 1834 pass to the Town of Refugio by or under the grant then made? The question must be answered in the negative if Article 5302 of the Revised Civil Statutes of 1925 is applicable, for that statute prohibits the making of surveys across streams having an average width of thirty feet or more, and has been construed as reserving the title to the beds of such streams to the sovereign. Austin v. Hall, 93 Texas 591, 57 S. W. 563; State v. Bradford, 121 Texas 515, 50 S. W. (2d) 1065; Chicago, R. I., etc., Ry. Co. v. Tarrant County Water Control and Improvement District No. 1, 123 Texas 432, 73 S. W. (2d) 55; Diversion Lake Club v. Heath, 126 Texas 129, 86 S. W. (2d) 441. In the Bradford case it is held that a survey and patent across such stream, while otherwise valid, do not divest the State of its title to the bed of the stream.

4   Article 5302 is a continuation of Sections 21 and 42 of an Act of the Republic of Texas passed December 14, 1837 (1 Gammel's Laws, pp. 1412, 1418), and the rule which it prescribes has no application to a grant made in 1834, unless there was then in effect a similar law or unless the statute is declaratory of a rule or policy of the civil law of Mexico. It was held in State v. Grubstake Investment Association, 117 Texas 53, 297 S. W. 202, that grants made in 1835 by Coahuila and Texas of lands bordering on the Frio River conveyed to the grantee no title to the bed of the river. Associate Justice GREENWOOD said in the opinion: "It would seem from the holding in Phillips v. Ayres (45 Texas 609) that our Texas statutes defining navigable streams and limiting the frontage of surveys thereon and forbidding the inclusion of lands on both sides of the streams, were but adaptations of the former Mexican laws." And in reaching the conclusion that the grantees of lands adjoining the river acquired no title to the river bed, he treated the statutes of Texas as mere adaptations of the previous laws of Mexico and gave "to the laws of Mexico the same efficacy in reserving title to the river beds in the sovereign as we give to the Texas Statutes."

Chief Justice CURETON, in Manry v. Robison, 122 Texas 213, 232, 56 S. W. (2d) 438, said: "Subsequent to the adoption of the common law we have ignored its rule that grants on streams above tidewater carry title to the thread of the stream, and

have continued to apply *the civil law rule, of which the Act of 1837 is an adaptation, to the effect that the beds of streams there defined are the property of the State.*" (Our italics.)

In Phillips v. Ayres, 45 Texas 601, the Court was determining the location of one of the lines of a survey granted under the laws of Coahuila and Texas in 1833. Associate Justice MOORE, as a reason for rejecting the location of the line in a place where it would cross Leon River, said: "But to so run, it would conflict with the call for a survey on the left margin of the river, *and would violate the law forbidding the crossing of streams of this character.*" He further said with reference to constructing the line in such way that it would cross the stream: *"As it was then and still is contrary to law for the surveyor to so run it,* the Court should not presume that it was in fact thus run, or take it as the proper basis upon which to construct the survey." (Our italics.)

It became necessary in Swisher v. Grumbles, 18 Texas 164, to determine the location of the upper line of the Isaac Decker league, granted in 1835 under the laws of Coahuila and Texas, and to fix the boundary along Spring Creek, which the evidence showed to have an average width of from fifty to eighty yards. Associate Justice WHEELER, in discussing these boundaries, said:

"It is to be borne in mind that where the upper line of the league approaches the creek, and thence down to the bank of the river, *the creek is of such width that the line could not cross it; being deemed, by the law, a navigable stream.* Had it been a narrow stream, the upper line of the survey would have been continued across it in a right line to the river." (Our italics.)

Thus the Court expressed its opinion that the creek was, under some statute or some rule of civil law in effect in 1835, deemed because of its width a navigable stream which the line of a survey could not lawfully cross.

Notwithstanding the foregoing statements quoted from opinions of the Supreme Court, we have not been able to find any law of Coahuila and Texas, or other law in effect prior to 1837, declaring streams of a width of thirty feet, or other width, navigable or expressly prohibiting the making of surveys across such streams. The Colonization Law of March 24, 1825, in which the title to the four leagues originated, contains no such provisions and nothing concerning surveys on rivers or other streams. "The Instructions to Commissioners of September 4, 1827" for the distribution of lands to new colonists under the

1825 law, referred to in Town of Refugio v. Byrne (supra), gives directions for laying off towns, dividing them into lots and measuring surveys with the greatest accuracy, but there are no directions about making surveys on or near streams. 1 Gammel's Laws, pp. 180-183.

Section 29 of the Colonization Law of April 28, 1832, which expressly repeals the law of March 24, 1825 (saving, however, the rights of those having contracts or concessions under the repealed law), provides that "the survey of vacant lands that shall be made upon the borders of any river, running rivulet or creek or lake shall not exceed one-fourth of the depth of the land granted." (1 Gammel's Laws, pp. 299-303.) And Article 22 of the Colonization Law of March 26, 1834, provides: "Lands fronting on permanent creeks, rivers, large lakes, bays and the sea shore, shall run back double the extent of their front." (1 Gammel's Laws, pp. 357-362.) These articles of the laws of 1832 and 1834 are similar in language to Section 21 of the Act of December 14, 1837 (the first part of Article 5302) which requires lands surveyed on navigable water courses to front one half of the square on the water course. The primary purpose in these similar provisions of the several laws was to prevent a locator from monopolizing the water front and the water by extending his survey up and down the margin of the stream. Thus the waters were made to serve as many people as possible. Austin v. Hall, 93 Texas 591, 597, 57 S. W. 563; Motl v. Boyd, 116 Texas 82, 109, 286 S. W. 458. But the consequence of making locations in compliance with such laws is, as pointed out in Austin v. Hall, that the title to the beds of the streams remains in the sovereign. These provisions are very reasonably construed as implied prohibitions against making surveys across streams. While they do not expressly prohibit crossing streams, they direct or at least contemplate that the surveys shall front or lie on the water courses rather than across them. If we are correct in this conclusion, then Section 21 of the Act of 1837 (the first part of Article 5302) is a continuation of the articles of the Acts of 1832 and 1834 above quoted, and Section 42 of the Act of 1837 (the other part of Article 5302) is an adaptation of those articles of the Acts of 1832 and 1834, in that it expressly prohibits the making of surveys across streams thirty feet or more in width, whereas the articles of the prior laws impliedly prohibited the making of surveys across rivers or running, or permanent, creeks of whatever width. If we are correct in the conclusion that Article 29 of the Act of 1832 impliedly prohibited the making of surveys across rivers and running or permanent creeks, with a

consequent retention by the sovereign of title to the beds of
the streams, then the survey of the four leagues for the Town
of Refugio was, to the extent of its inclusion of the bed of
Mission River, in violation of that law, and the title to the river
bed remained in the sovereign. While it is true that the first
steps for the founding of the town were taken in 1830 and 1831,
the town acquired no right to any certain four leagues of land
until the survey was made in 1834, and the survey should have
respected Article 29 of the Act of 1832 then in effect.

5　The positive statements above quoted from opinions of the
Supreme Court to the effect that a law of Coahuila and Texas
forbade the making of surveys across rivers and other streams,
together with what appears to be the implied prohibition in
Article 29 of the Act of 1832, are sufficient, we think, to sup-
port the conclusion that the inclusion of the bed of the Mission
River within the boundaries of the survey made in 1834 for
the Town of Refugio was contrary to law and that the sov-
ereign retained the title to the river bed. We need not rest
the decision, however, on that ground. It was within the power
of the sovereign to grant to a town or to an individual the
bed of public water. City of Galveston v. Menard, 23 Texas 349,
391; Knight v. United Land Association, 142 U. S. 161, 35
L. Ed. 974, 983. But it is well settled that a more certain and
specific intention on the part of the government must appear
to divest itself of title to land under water than is required
for the passing of title to land not so covered. City of Gal-
veston v. Menard, 23 Texas 349, 397; State v. Bradford, 121
Texas 515, 530, 543, 50 S. W. (2d) 1065; Landry v. Robison,
110 Texas 295, 298, 219 S. W. 819; Rosborough v. Picton, 34
S. W. 791, 792 (approved in Hynes v. Packard, 92 Texas 44,
49, 45 S. W. 562). In State v. Bradford Associate Justice SHARP,
writing as Commissioner the opinion of the Court, said: "The
rule is also firmly established that land under navigable waters
passes by grant or sale only when so expressly provided by
the sovereign authority, and there is no presumption that there
has been any act of the government which could have the ef-
fect of passing away its title." It is not to be presumed that
the Mexican Government intended to grant to the Town of
Refugio the title to a part of the bed of Mission River, and
we must conclude that the title to the river bed did not pass
by the grant made in 1834 unless a certain and specific inten-
tion that it pass can be found in the documents or other evi-
dence of the grant or in the statutory law in effect when the
grant was made or in some settled rule or policy of the civil
law then prevailing in Mexico.

There was no formal grant and there are no field notes or other description of the survey originally made and no documents evidencing the steps taken for the acquisition of the title. Neither the Colonization Law of 1825 under which the title was acquired nor the Colonization Law of 1832 contains anything to indicate an intention on the part of the State of Coahuila and Texas to grant to towns the title to the beds of public waters. There seems to be, as has been said, an implied prohibition in an article of the 1832 law against the making of surveys across rivers and running creeks.

**6** Looking generally to the rules and policies of the civil law, we find that they negative rather than prove the existence of an intention on the part of the government to divest itself of title to the bed of a stream of this size and kind. The civil law prevailing in Mexico was most favorable to public ownership. A striking example of that fact is found in the law of Mexico by which all mines belonged to the sovereign and under which minerals did not pass by the ordinary grant of land without express words of designation. Cox v. Robison, 105 Texas 426, 431, 150 S. W. 1149. Law 6, Title 28, Part 3 of the Partidas declares that "Rivers, harbors, and public highways belong to all persons in common." It was held in Mitchell v. Bass, 26 Texas 372, 33 Texas 259 (cited in State v. Grubstake Investment Association, 117 Texas 53, 61, 297 S. W. 202), that according to the civil law rule Mexican grants made in 1831 of lands bounded by a public road passed title only as far as the edge of the road and not to the middle of the road as at common law. By the rule of the civil law private ownership of land along the coast stops at the line of highest tide in winter, whereas the rule at common law restricts grants to the line of ordinary high tide. City of Galveston v. Menard, 23 Texas 349, 399.

The civil law of Mexico, in its designation of rivers as public property, made no distinction by reason of navigability or nonnavigability. State v. Grubstake Investment Association, 117 Texas 53, 56, 297 S. W. 202. Chief Justice CURETON, in Manry v. Robison, 122 Texas 213, 230, 231, 56 S. W. (2d) 438, said that under the civil law all perennial streams were public, and further:

"The status of the law in Texas when we adopted the common law as the rule of decision in 1840 was as follows: Texas owned the beds of all *perennial streams, regardless of navigability,* whether grants of land adjacent were made by Spain and Mexico prior to March 2, 1836, or by the Republic of

Texas prior to the Act of 1837, *by virtue of the civil law of Mexico.*"

The opinion of the Chief Justice in Motl v. Boyd, 116 Texas 82, 286 S. W. 458, which contains a careful review of the law in Texas with respect to the waters of rivers and other flowing streams since the days of Spanish sovereignty, clearly demonstrates that the several governments have, under the influence of the civil law, jealously guarded from private appropriation and reserved for common use not only the waters of the streams but also, and in further assurance of the common use and benefit, their beds.

Associate Justice GREENWOOD found in Law 31, Title 28, Part 3 of the Partidas the principal support for the conclusion that grants of land on the Frio River made in 1835 did not convey to the grantees title to the bed of the river. The substance of that law is that when a river takes a new course, abandoning its former bed, the abandoned bed will belong to the owners of the adjoining lands, and the owner of the land through which the river makes its new bed will lose the property in the soil it covers, which will be of the same nature as the former bed and vest in the public. That law clearly evidences a policy of public ownership of all river beds. It assumes that they belong to the public prior to their abandonment and it assures continued public ownership by going to the extent of taking (not merely withholding) title from private ownership and vesting it in the public.

We do not hold that all grants made under the laws of the State of Coahuila and Texas that include within their exterior boundaries beds of rivers are void as to the river bed areas. But we hold that the Town of Refugio did not acquire by the grant of the four leagues of land made to it in 1834 title to the part of the bed of the Mission River within the four leagues. There is no evidence in the law by virtue of which the grant was made or in the documents effecting the grant, of a certain and specific intention on the part of the government to divest itself of title to the river bed. Presumption and the policy of the Mexican civil law favor public ownership, and in our opinion the mere inclusion of the river bed area within the boundaries of the survey of the four leagues is not sufficient to overcome that presumption and policy.

7 The argument is made that the grant should be construed as vesting the title to the river bed in the Town of Refugio in trust for the public, it being a governmental agency. We find nothing to indicate such intention and can not assume it

in contradiction of the statement so often made in the decisions that the government has reserved the title to the beds of such streams to itself in trust for *all* of the people. City of Galveston v. Menard, 23 Texas 349, 397; Landry v. Robison, 110 Texas 295, 298, 219 S. W. 819; State v. Bradford, 121 Texas 515, 544, 50 S. W. (2d) 1065; Chicago, R. I., etc., Ry. Co. v. Tarrant County Water Control and Improvement District No. 1, 123 Texas 432, 446, 73 S. W. (2d) 55; Diversion Lake Club v. Heath, 126 Texas 129, 138, 86 S. W. (2d) 441. Laws 9 and 10, Title 28, Part 3 of the Partidas enumerate, as properties that may be owned by cities and towns, fountains, squares, the sandy beaches on the banks of rivers, the commons, roads, pastures, vineyards, gardens and olive groves, and declare that they are owned for the benefit of all the inhabitants of the cities and towns. There is no suggestion that beds of rivers adjoining or across lands belonging to cities and towns may be owned by the cities and towns for the benefit of their inhabitants.

The opinion expressed herein as to the title acquired by the Town of Refugio under the Mexican grant is not in conflict with Anderson v. Polk, 117 Texas 73, 297 S. W. 219. It was not held in that case that the Spanish grant was effective of itself to divest the sovereign of title to the bed of the San Antonio River. It was held that the allegation in the petition for mandamus that the tract sued for, formerly a part of the bed of the river, was unsurveyed land belonging to the school fund, was not sufficient to override the presumption arising from the fact alleged in the petition that the Commissioner of the Land Office held the land to be titled and other facts judicially known by the Court. Among public statutes of which the Court took judicial knowledge were several Acts of the Legislature of the State which recognized the title of the City of San Antonio to the river bed by expressly conferring upon the city general powers of control over the river and its bed. The title of the city to the bed of the San Antonio River was further confirmed by an act of the 39th Legislature (cited in State v. Bradford, supra), by which the State relinquished and granted to all incorporated cities and towns having a population of forty thousand inhabitants or more the beds of all rivers within the corporate limits of such cities and towns (Acts Reg. Sess. 39th Leg., 1925, Ch. 155, pp. 366-367). We find no similar statute, except the Small Bill hereinafter discussed, affecting the Town of Refugio.

The State by an Act of the regular session of the 41st Legislature, known as the Small Bill (Chapter 138, pp. 298-303),

relinquished, quitclaimed and granted to patentees and awardees, and their assigns, of lands lying across or partly across water courses or navigable streams, all of the beds of such water courses and streams, and the minerals therein contained, included in surveys of such lands theretofore made, and to which lands patents had been issued and were outstanding for a period of ten years. By the third section of the Act all of its provisions are made to apply to all Spanish and Mexican grants and titles issued prior to the Texas Revolution and subsequently recognized as valid by the Republic of Texas or by the State of Texas. This law was attacked by the State as unconstitutional on various grounds and its validity was sustained in State v. Bradford, 121 Texas 515, 50 S. W. (2d) 1065. It is apparent that the Act gave the Town of Refugio title to that portion of the bed of Mission River within the bounds of the four leagues granted to the town, unless the tract granted, including the river bed area, contains more than four leagues of land. The second section of the Act contains a provision that it shall not "relinquish or quitclaim any number of acres of land in excess of the number of acres conveyed to said patentees or awardees in the original patents granted by the State."

The Small Bill became effective March 3, 1929. The deeds by which the Town of Refugio in the years 1848 to 1852 conveyed the farm lots adjoining the river to those under whom plaintiffs in error hold conveyed no part of the bed of the river, because the river bed was then owned by the State. Since the Small Bill was enacted less than ten years ago, plaintiffs in error have not acquired by adverse possession the title that may have passed to the Town of Refugio under that law.

The record contains no evidence as to the number of acres within the boundaries of the four leagues of land surveyed for the Town of Refugio in 1834, and the cause will be remanded to the district court for ascertainment of that fact. If it is found that the tract surveyed for the town in 1834 contains, including the river bed, no more than four leagues of land, judgment will be rendered in favor of the defendant in error (whether the State of Texas becomes or does not become a party to the suit) for the title and possession of that part of the land described in its petition which is a portion of the bed of the Mission River. If the said tract surveyed for the Town of Refugio is found to contain, including the bed of the river, more than four leagues of land, judgment will be rendered dismissing the cause, unless the State of Texas becomes a party to the suit. If the State of Texas becomes a party to the suit, and it is found that the said tract surveyed for the town con-

tains, exclusive of the river bed, as much as four leagues of land, judgment will be rendered in favor of the State for the title and possession of the river bed. If the State of Texas becomes a party to the suit and it is found that the said tract surveyed for the town contains, exclusive of the river bed, less than four leagues of land, judgment will be rendered, under proper pleadings, partitioning the entire river bed within the said tract surveyed for the town in 1834 between the State of Texas and the Town of Refugio in such manner as to award to the Town of Refugio the number of acres of river bed area sufficient to supply the said deficiency. The method of fixing the boundary between the river bed and the adjoining lands is stated in Motl v. Boyd, 116 Texas 82, 109, 286 S. W. 458, and in Diversion Lake Club v. Heath, 126 Texas 129, 141, 86 S. W. (2d) 441.

The judgments of the trial court and of the Court of Civil Appeals, except as to the 5.28 acre tract, are reversed and the cause is remanded to the district court for further proceedings as herein directed.

Opinion adopted by the Supreme Court March 24, 1937.

Rehearing overruled May 5, 1937.