**STATE et al. v. HEARD et al.**

No. 9594.

Court of Civil Appeals of Texas. Austin.
Dec. 18, 1946.

Rehearing Denied Jan. 8, 1947.

**192**

Grover Sellers, Atty. Gen., Harris Toler, Asst. Atty. Gen., Wm. J. Fanning, Sp. Asst. Atty. Gen., Zellner Eldridge, of Dallas, (Sanford, King, Estes & Cantwell and Conan Cantwell, all of Dallas, Davis, Hall, Clemens & Knight and J. R. Davis, all of San Antonio, Critz, Kuykendall, Bauknight, Mann & Stevenson, of Austin, of counsel), J. R. Davis and J. C. Hall, both of San Antonio, and Richard Critz and F. L. Kuykendall, both of Austin, for appellants.

Blades, Chiles, Moore & Kennerly, Wm. Sears McGee, Fred W. Moore, John F. Heard, and Hunt & Lawler, by James F. Lawler, all of Houston, and Geo. E. Shelley, of Austin, for appellees.

BAUGH, Justice.

Suit was by the State and the Town of Refugio (hereafter referred to as the Town) against numerous named individuals, and the Houston Oil Company, in trespass to try title to 15.65 acres of land, being a part of the bed of the Mission River in Refugio County. The W. R. R. Oil Company and Jack E. Gaines, holders of an oil and gas lease on the land sued for, intervened. The portion of the river bed here involved lies in the western part of a grant of four leagues made by Coahuila and Texas to the Town of Refugio in 1834. The suit was filed on March 6, 1939. The defendants, appellees here, claimed title to said lands under the ten-year statute of limitation by virtue of the provisions of the Relinquishment Act, commonly referred to as the Small Bill, which became effective March 3, 1929. See Art. 5414a, Vernon's Ann.Civ.St. Trial was to the court without a jury before Judge J. O. Moore, who died after the close of the evidence but before judgment. The record of that trial, without further evidence, was thereupon submitted to his successor in office, and judgment rendered that the appellants take nothing; and that the appellees be quieted in their limitation title to said lands; hence this appeal.

In its judgment the trial court found, among other things, as follows:

1. That the original grant to the Town of Refugio contained, including the river bed, exactly four leagues of land;

2. That consequently, on March 3, 1929, the effective date of the Relinquishment Act, and under said Act, title to the river bed vested in the Town;

3. That continuously after said March 3, 1929, appellees had said lands enclosed by good fences under claim of ownership, which was adverse, open, visible, notorious and hostile to said Town;

4. That the mandate of the Supreme Court issued out of the case of Heard v. Town of Refugio, 129 Tex. 349, 103 S.W.2d 728, had not been complied with;

5. That the judgment in that case was not binding upon the defendants (appellees) in the instant case;

6. That the survey made of the lands involved in this suit was not made in accordance with the decisions of the Supreme Court of Texas;

7. That the portion of the river here involved constituted a statutory navigable stream.

Obviously findings Nos. 2 and 5 are conclusions of law and not findings of fact. Finding No. 7 is not attacked. If the trial court erred in finding No. 3, then findings Nos. 1 and 4 become unimportant in so far as appellees are concerned. The first contention made by appellants is that the trial court did err in its finding No. 3, in that under well settled decisions, the possession, use, and occupancy by appellees of the river bed in question between March 3, 1929, when the Small Bill became effective, and March 6, 1939, when this suit was filed, under the undisputed facts, fails to sustain a limitation title in appellees. We have concluded that this contention should be sustained.

■■ The lines of the original grant to the Town called to cross the Mission River. The calls for the lines of the tracts subsequently conveyed and now owned by appellees do not cross said River. It was determined in the case of Heard v. Town of Refugio, 129 Tex. 349, 103 S.W.2d 728, and by the trial court in the instant case, that the portion of the River here involved was navigable under Art. 5302, Vernon's Ann. Civ.St. The bed thereof consequently belonged to the State prior to the effective date of the Relinquishment Act; and subsequent to that time was governed by the provisions of that Act. These questions were all adjudicated by the Supreme Court in Heard v. Town of Refugio, supra, and that case reversed to give the State an opportunity to assert its claim to the river bed; and to determine under the formula laid down by the Supreme Court in that case, the respective interests of the State and the Town in the sector of the river bed there involved. The holding of the Supreme Court in that case, and the formula therein laid down, was clearly intended to apply, and we think of necessity must apply, to all of the navigable portion of said river bed within the boundaries of the original grant, either under the doctrine of res adjudicata or stare decisis. For our purposes here we deem it unnecessary to determine which. If, as found by the trial court in the instant case, there was no excess acreage in the original grant, then title to all of said river bed within the boundaries of the original grant, passed, under the Relinquishment Act and subject to its terms, to the Town on March 3, 1929. If there were an excess in said grant, then, dependent upon the amount of such excess, title to the river bed either remained in the State, or passed in part to the Town. See Heard v. Town of Refugio, supra. As to such part, if any, as remained in the State limitation would not run in favor of appellees. Art. 5517, R.C.S. As to such as vested in the Town under said Act, limitation would run in favor of appellees, provided their possession, occupancy and use met the requirements of the statutes and decisions essential to ripen their claim into a ten-year limitation title.

Considering now the issue of adverse possession, the record shows that the Mission River in this area runs from northwest to southeast. Mrs. F. V. Heard in 1929, and long prior and subsequent thereto until her death in 1939 or 1940, owned a 600-acre tract lying north and south across the portion of said river here in controversy. In June 1925 she executed an oil and gas lease on said 600-acre tract to the Houston Oil Company, with full rights of ingress and egress to and upon said lands for development purposes, to build tanks, run pipe lines, etc., on all or any part of same. As early as 1904 said tract of land had been fenced, the fences crossing said river, capable of retaining stock in said pasture, and with water gaps across the thread of the stream which the flow of flood waters in the channel would open; but which were kept closed when the stream was not at flood level, so as to prevent passage of live stock into and out of such pasture via the bed of the stream. These fences across the stream were maintained at all times from 1904 up to the time this suit was filed; and the lands enclosed by them used for grazing live stock, in addition to use in oil and gas development. The Houston Oil Company assigned a part of its acreage, but retained 400 acres of the original 600, which it developed for oil and gas, erected tanks, pumps, and other essential equipment thereon at its wells, none of which were in

the river bed, and laid gathering pipe lines over and upon the area, some of which crossed the bed of the stream. The character and use of both the bed of the stream and of the adjoining riparian lands by appellees and their predecessors in title was exactly the same after March 3, 1929, as it had been theretofore.

■ The character of adverse possession which will ripen into a limitation title under Arts. 5510–5516, Vernon's Ann.Civ. St., has been repeatedly adjudicated. The stringent rule laid down in Satterwhite v. Rosser, 61 Tex. 166, as necessary to deprive an owner of legal title to his property by an adverse claimant, is, in addition to being continuous and uninterrupted for the statutory period, that such possession must be "actual, notorious, distinct and hostile, and of such character as to indicate unmistakably an assertion of a claim of exclusive ownership in the occupant." That holding was approved again by Judge Gaines in Evans v. Templeton, 69 Tex. 375, 378, 6 S.W. 843, 5 Am.St.Rep. 71, and has continuously prevailed since. See Burton v. Holland, Tex.Civ.App., 278 S.W. 252; Churchman v. Rumsey, Tex.Civ.App., 166 S.W.2d 960, 962; Epps v. Finehout, Tex. Civ.App., 189 S.W.2d 631, 632.

■ But appellees urge, and the trial court apparently so concluded, that the fencing of property plus claim of ownership and use for grazing purposes for the requisite period of time suffices to mature such title in the claimant, citing, among others, Wingfield v. Smith, Tex.Civ.App., 241 S.W. 531 (writ ref.); Port City v. Peck, Tex.Civ.App., 42 S.W.2d 275; Young v. City of Lubbock, Tex.Civ.App., 130 S. W.2d 418; 2 Tex.Jur., §§ 46–47, pp. 88–91, and cases therein cited. Such is the rule announced in the cited authorities. But none of those cases involved river beds of navigable streams, which both in the character of the lands involved and the uses to which they may be adapted, differ essentially from uplands which are adaptable to grazing or cultivation. In Nona Mills v. Wright, 101 Tex. 14, 102 S.W. 1118, 1121, Judge Brown announced the rule as follows: "To constitute adverse possession, the party occupying the land must in some way appropriate the land *for some purpose to which it is adapted.* Mere occupancy of land *without any evidence of an intention* to appropriate it will not support the statute of limitation." (Emphasis ours.) See also Hardy v. Bumpstead, Tex.Civ.App., 41 S.W.2d 226, 76 A.L.R. 1488.

■ Under these authorities what then were the uses to which said river bed was adapted, what use was made of it by appellees, and what evidence was there to put the Town upon notice that appellees were claiming title thereto adversely to the Town? The actual bed of the river, the only land here in controversy, when delineated according to the formulas laid down by the Supreme Court in Motl v. Boyd, 116 Tex. 82, 286 S.W. 458; and Diversion Lake Club v. Heath, 126 Tex. 129, 86 S.W.2d 441; and as shown by the proof herein, was either covered by water or, when the steam was low, left in sand bars devoid of vegetation. It was not therefore adapted to grazing, for the simple reason that nothing grew therein upon which live stock could graze. Nor do we find any evidence that live stock ever used such river bed for grazing. The only purpose to which it was adapted, and for which appellees could have used it, was for fishing, hunting, watering live stock, domestic use and irrigation. It being in law a navigable stream, appellees had and could exercise as riparian owners all these rights and privileges as against the Town without claiming or needing any title to the land in order to do so. Such uses and enjoyment could not be denied them by the owner of the legal title to such river bed. Motl v. Boyd, supra; State v. Bradford, 121 Tex. 515, 50 S.W.2d 1065; Diversion Lake Club v. Heath, supra. Their exercise of these rights then was neither inconsistent with, adverse, nor hostile to, the Town's title. Claim of ownership of title was in no wise essential to the assertion or enjoyment of any such rights; and they were vouchsafed by law to appellees regardless of who owned the land in the river bed. Ownership not being in anywise necessary to the existence or enjoyment of such rights; how can it be said that the mere exercise of such rights given them by law would be any notice to the Town of an adverse claim of title? Their

exercise, therefore, not being adverse nor hostile to the Town's ownership, such use would not constitute any notice to the Town that its title was being challenged.

The other evidence particularly emphasized and relied upon by appellees to support a limitation title is the continuous maintenance of their fences across the bed of the stream; and the laying by the Houston Oil Company of pipe lines across it. The latter was, we think, clearly no evidence of an adverse claim of title to the lands over which they were laid. No attempt was made by said oil company to produce or recover the oil and gas beneath the river bed by drilling wells therein. The pipes were laid and used only for the gathering and transportation of the oil and gas produced outside of such river bed. At most the right to lay pipes over the lands of another, or doing so without the permission of the owner could amount to no more than the assertion of an easement over such lands for such purposes; and an easement does not constitute nor defeat an adverse claim of title. Young v. City of Lubbock, Tex.Civ.App., 130 S.W.2d 418, 420; 2 C.J.S. Adverse Possession, § 51, p. 568; 1 Am.Jur., § 138, p. 872.

The most serious question presented as evidencing an adverse and hostile claim is that of fencing. Was that sufficient, under the circumstances of the instant case, to give notice to the Town of an adverse claim of title? We have concluded that it did not. The stream in question, though navigable in law, was not navigable in fact. It did not constitute a barrier to the passage of live stock to and from the riparian lands on either side of it; nor would said stream, without a fence across it, have prevented the passage of cattle via the river bed at normal flow of the stream to and from the lands owned by appellees and those of other riparian owners above and below. The only way appellees could have contained their cattle, therefore, on their own lands was either to erect such fence across the bed of the stream, or to erect fences along each bank thereof so as to enclose their own lands and contain their live stock thereon. The latter course would, in part at least, have deprived appellees of the rights in the use of such stream and its waters, to which they, as riparian owners, were entitled under the law. We think it is clear that the erection and maintenance by appellees of such fences across the river bed were designed and intended primarily to keep their cattle on their own lands without regard to the legal ownership of the bed of the river. The Town, as owner of the legal title, could not have fenced off the river bed without interfering with legal rights of the riparian owners; and the riparian owners could not contain their cattle on their own lands without extension of their fences across the bed. Under these circumstances, building and maintaining of such fences, when coupled with the only use they made of the river bed, was just as consistent with a recognition of the Town's legal title to such lands, as with a denial of such title; and did not evidence such open, visible, notorious, hostile and adverse claim of ownership of such title in appellees as meets the requirements of the statutes and the rules announced in the decisions above cited. The erection of fences absolutely essential to keep stock enclosed on the lands to which they already had legal title, under the peculiar circumstances here presented, does not, in our opinion, "indicate unmistakably an assertion of a claim of exclusive ownership" by appellees of the lands constituting the river bed. We think the court erred in so finding.

We agree with appellees that fact findings in a trial to the court, if there be substantial evidence to support them, should on appeal be given the same consideration as would findings by a jury. But that is not the issue here presented. The issue here is whether the uncontroverted facts as shown by the record will, as a matter of law sustain a limitation title in appellees. Our conclusion is that under the well settled decisions they do not.

Under the conclusion above stated the failure of the district court upon remand to it by the Supreme Court in Heard v. Town of Refugio, supra, to comply with its mandate, if it did so fail, adds

nothing to appellees' claim of limitation title to the lands here involved. And even if it be conceded that the judgment in that case, as to the lands there involved, be not binding upon the appellees as to different lands involved in the instant case; the settled principles of law announced in that case and in Motl v. Boyd and State v. Bradford, do apply to the river bed of any navigable stream in Texas. Under established decisions, therefore, when it was made to appear, as the trial court found in the instant case, which finding is not attacked, that the section of the Mission River here involved was in law navigable, then, prior to March 3, 1929, the title to same was in the State. Under the Small Bill, the State's title, dependent upon the acreage contained within the boundaries of the original grant, either remained in the State or passed in whole or in part to the Town. None of it passed to the appellees. And if, as we have concluded, the appellees have acquired no title to said lands by limitation, they have no interest in the division thereof as between the State and the Town. Under these circumstances, therefore, and the conclusion we have reached on the issue of limitation, whether or not the trial court was in error in its findings and conclusions Nos. 1, 4 and 5, as above set out, becomes immaterial. This being a separate and distinct suit from the case of Heard v. Town of Refugio, 129 Tex. 349, 103 S.W.2d 728, involving different lands, but constituting the bed of a stream navigable in law, and the facts relating to title being without substantial dispute, this case should be determined under well settled principles of law relating to river beds, and to titles by limitation, as laid down in Heard v. Town of Refugio and other Supreme Court decisions, regardless of the disposition of the particular lands involved in that suit.

The only remaining question material to this appeal is whether or not the survey of said river bed was made in accordance with the decisions of the Supreme Court defining what constitutes the boundaries of the river bed of a navigable stream. Since appellees' lands extend to the bed of such stream, they are of course materially interested in the establishment of such lines; and are here contending that in the survey as made, the surveyor went beyond the legal boundaries of such river bed and included some of their lands. The field notes themselves do not disclose the location of said lines with reference to the banks of the stream. The proof as to such location was made by the testimony of the surveyor and several photographs of the section of the river bed here involved. It is impracticable to set same out in this opinion. We have reached the conclusion, however, upon careful consideration of the testimony of the surveyor, and his explanation of the photographs of the banks and bed of the stream, that he erroneously interpreted and applied the rule laid down by the Supreme Court in making said survey and in fixing the boundaries of said area.

The law with reference to the location of such boundaries appears to be well settled. It was first considered at some length by the Supreme Court of Texas in Motl v. Boyd, 116 Tex. 82, 286 S.W. 458, 467, further clarified in Diversion Lake Club v. Heath, 126 Tex. 129, 86 S.W.2d 441, reannounced and applied in Heard v. Town of Refugio, supra; State v. R. E. Janes Gravel Co., Tex.Civ.App., 175 S.W.2d 742; Maufrais v. State, 142 Tex. 559, 180 S.W. 2d 144, 147. The difficulty encountered is in applying the rule stated to the physical facts on the ground. It seems clear that in the instant case the surveyor deemed the "cut banks" of the stream as extending from the normal water level in the bed of the stream to the top of the prairie level bank, above which the flood waters would leave said banks and overflow the adjacent lands; and then fixed the boundary line half way between these two points. At some places the vertical distance between two such points appears to be twenty or more feet. The record shows the major portion of what the surveyor deemed cut banks is covered with substantially the same character of vegetation, brush, trees and other growth as are the uplands. Under the cases above cited, with which the surveyor stated he was familiar and had studied, we think his survey included more land than is legally contained within such river bed.

The definition of such boundary as stated in Motl v. Boyd is taken almost verbatim from the language of the United States Supreme Court in Oklahoma v. Texas, 260 U.S. 606, 623, 43 S.Ct. 221, 225, 67 L.Ed. 428. It is stated in Diversion Lake Club v. Heath that the Texas Supreme Court in defining the line between public and private lands along navigable streams in Texas deliberately adopted the rule laid down in Oklahoma v. Texas. One of the Commissioners whose recommendation was adopted by the United States Supreme Court in Oklahoma v. Texas, testified in State v. R. E. Janes Gravel Co. (idem Maufrais v. State) as to the application on the ground of that formula. We think it is clear that the "cut banks" of the stream referred to and defined in Oklahoma v. Texas, which confine the stream, and the medial line of which mark its boundaries, do not extend to the top which marks the prairie level; but that the court intended to confine such "cut banks" to the water washed surface thereof beginning at water level at normal flow and extending outward and upward to a point or a line on said bank which is habitually washed during the year by the variation up and down in such flow caused by the normal rains. That is, such portion of the bank that during the course of the year, is ordinarily washed free of vegetation. Its location and vertical altitude above the low waters in the bed of the stream during droughts, or as they appear after the surface rain waters have drained off and flowed down the stream, will, of course, vary with the width of the bed of the stream and the degree of the acclivity of the banks at any given point. That the top of such cut bank, or water washed bank, is not the same as the top of the bank above which the waters of the stream leave its channel and overflow the riparian lands, is made clear by the following language of the United States Court in Oklahoma v. Texas: "When we speak of the bed we include all of the area which is kept practically bare of vegetation by the wash of the waters of the river from year to year in their onward course, although parts of it are left dry for months at a time; *and we exclude the lateral valleys, which have the characteristics of relatively fast land and usually are covered by upland grasses and vegetation, although temporarily overflowed in exceptional instances when the river is at flood.*" (Emphasis ours.)

An examination of the photographs of said river bed and banks which constitute a part of the record, as explained by the surveyor, and his testimony showing that he based his medial line half way between the bed of the stream and the topmost line of the bank, which was not reached by the waters of the stream except "when the river is at flood"; and further, that the banks which he regarded as "cut banks" show to be covered "by upland grasses and vegetation" and not to be water washed except near the bed of the stream; clearly discloses, we think, that the surveyor who ran the boundaries of the lands sued for, misconstrued and misapplied the rule announced by the Supreme Court for determining such boundaries, and included therein lands which appellants as owners of the river bed were not entitled to recover.

We have not undertaken to discuss all of the contentions made by the various appellants for the reason that the above stated conclusions in our opinion are determinative of this appeal. Under the foregoing conclusions the judgment of the trial court is reversed and the cause remanded with instructions to the trial court to cause the portion of said river bed to be correctly resurveyed at the cost of appellants, said survey to be made in accordance with the holdings of the Supreme Court in the cases cited, and that judgment be rendered for appellants, as their respective interests appear, for title and possession of the lands so constituting the river bed of said stream in the area described.

Reversed and remanded with instructions.