J. R. STRAYHORN et al., Appellants,

v.

Ruth Leggett JONES et al., Appellees.

No. 6432.

Court of Civil Appeals of Texas.

Amarillo.

March 5, 1956.

Rehearing Denied April 16, 1956.

McMahon, Springer, Smart & Walter, Sayles & Sayles, Abilene, Adkins, Folley, McConnell & Hankins, Amarillo, Lester Whipple, Robert Hausser, Josephine F. Verain, San Antonio, John Ben Shepperd, Atty. Gen., J. A. Amis, Jr., Asst. Atty. Gen., and A. T. Mullins, Austin, for appellants.

Wagstaff, Harwell, Alvis & Pope, Childers & Childers, Abilene, Vinson, Elkins, Weems & Searls, Tarlton Morrow, Ben H. Rice, III, Fountain, Cox & Gaines, Willard B. Wagner, Williams, Lee & Kennerly, Willard B. Wagner, Jr., Andrews, Kurth, Campbell & Bradley, W. M. Streetman, Richard F. Burns, Houston, Robert H. Dedman, Shank, Dedman & Payne, Dallas, Harry R. Dippel, Fort Worth, Stubbeman, McRae & Sealy, W. B. Browder, Midland, Ratliff, Conner & Walker, Spur, Morris G. Watson, Roby, for appellees.

MARTIN, Justice.

This cause of action was a suit in trespass to try title as filed by appellees. The lands, and minerals thereunder, in issue are located in Sections One, Three and Five of the original John Rodman Survey in Kent County, Texas in what is commonly known as the Salt Creek Oil Field. Title to the three tracts in the Rodman Survey passed regularly to D. R. Kendall who conveyed the same to W. W. Barron who conveyed the land in Sections Three and Five, North and West of the Salt Fork of Brazos River to J. A. Price on August 1, 1924; the land in Sections Three and Five south of the river to A. Wood on November 29, 1924; the land in the South half of Section One west of the river to R. G. Maben, Jr., on February 26, 1925; and thereafter on April 5, 1932, under a foreclosure of lien as against W. W. Barron by the Chicago Livestock Loan Company, a receiver's deed was executed to said company to Section Five and other lands east of the river which lands were later conveyed to Percy Jones as Independent Executor of the Morgan Jones Estate. J. A. Price conveyed to Stewart under whom Texas Gulf Producing Company holds as lessee; A. Wood's title has passed to Mrs. Maggie Wood, Horace Wood, Lamar Hunt and the Superior Oil Company. The Jones Estate title has passed in part into Continental Oil Company and General Crude Oil Company, lessees.

Appellee's cause of action against appellants, designated as Strayhorn and Springer herein, is a suit in trespass to try title as to Sections One, Three and Five but the title in issue is solely as to the river bed of the Salt Fork of Brazos River traversing such sections and minerals therein and to small strips and gores of land along each river bank and to a tract of land consisting of approximately 12.20 acres lying in Sections One and Three east of the river. The State of Texas as intervenor in the suit seeks to recover an alleged excess of acreage in the river bed as located in each of the three sections of land. It is the State's contention that in John Rodman's Surveys One, Three and Five there is an acreage in excess of the 640 acres patented in each section to the extent of at least 19.09 acres in Survey One, 18.88 acres in Survey Three and 19.32 acres in Survey Five. It is appellants' contention that they own by quitclaim deeds from W. W. Barron and the Chicago Livestock Loan Company all of the river bed of the Salt Fork of Brazos River and minerals therein as well as small strips and gores of land along each bank of the river bed and all that part of Sections One and Three east of the river. Appellants' reply brief in discussing the issues in this Court assumes appellants' complete ownership of the Salt Fork of Brazos River. However, ownership of title to the river bed and minerals therein is one of the principal issues to be adjudicated here.

Certain principles and issues concerning the overall litigation will be dispensed with

prior to determination of the various issues as to the respective tracts. The names of all the litigants and their many contentions as expressed under their various points and counter-points will not be repeated here as such would unnecessarily lengthen the opinion without adding any legal value thereto. A map of Sections One, Three and Five of the John Rodman survey of thirteen sections is incorporated in this opinion to more fully clarify the lands in issue and such tracts will be referred to herein by section numbers and also by the names inserted thereon indicating ownership.

All Jones interests will be referred to as Jones Estate. The rulings hereinafter made by the Court with reference to title to the lands in issue will constitute a disposition of all points and counter-points.

The jury issues, insofar as any points of appellants may question the sufficiency of the evidence to sustain the same, are found to be sustained by the overwhelming weight and preponderance of the evidence in the cause. Appellees in the cause must recover on the strength of their own title and not upon any weakness in the title of the appellant. The parties stipulated that the Salt Fork of Brazos River traversing the lands in issue is a statutory navigable stream.

Appellant's first and major contention is that various rulings made in litigation concerning whether the State of Texas or the Town of Refugio owned title to the river bed of the Mission River, as a matter of law, vested title to the bed of the Salt Fork of Brazos River and minerals therein in W. W. Barron as an assignee of the patentee or awardee of the lands here in issue. None of the briefs filed by appellants reveal any reason why W. W. Barron was selected by appellants to become vested with title to such river bed of the Salt Fork of Brazos River as the assignee of the patentee instead of some assignee of the patentee who was either prior or subsequent to W. W. Barron in the chain of title other than the fact that appellants obtained a quitclaim deed from W. W. Barron. Such contention of appellants wholly overlooks the fact that they are likewise claiming the lands and minerals in issue under a quitclaim deed from Chicago Livestock Loan Company. The cases cited by appellants in support of their theory above stated, that the river bed and minerals therein had become vested in W. W. Barron as a matter of law, of which cases Heard v. Town of Refugio, 129 Tex. 349, 103 S.W.2d 728 by the Supreme Court is the most illustrative, do not vest title to the river bed or minerals therein in W. W. Barron as asserted by appellants. Nor do such cases assert any legal principle

that vests title to the river bed or minerals therein in the Chicago Livestock Loan Company under the facts here in issue.'

An examination of the above cited case as principally relied upon by appellants, Heard v. Town of Refugio, supra, reveals that the controversy in such cause was principally between the State of Texas and the Town of Refugio. Since appellants assert that the above cause vests title to the river bed and the minerals therein, it is not revealed in their appellate briefs how appellants escape the ruling made by the Supreme Court in said opinion, 103 S.W.2d 734 [7]:

"The Small Bill became effective March 3, 1929. The deeds by which the Town of Refugio in the years 1848 to 1852 conveyed the farm lots adjoining the river to those under whom plaintiffs in error hold conveyed no part of the bed of the river, because the river bed was then owned by the state. Since the Small Bill was *enacted less than ten years ago,* plaintiffs in error have not acquired by adverse possession the title that may have passed to the Town of Refugio under that law."

It is beyond controversy in the cause here in issue that at the time appellants acquired their quitclaim deeds in 1948 and 1950, under which they claim title to the lands in controversy, the Small Bill had been enacted *more than ten years* and the lands here in issue in possession of the respective appellees for periods of time ranging from approximately twelve to twenty-five years. But, the controversy in the Refugio case principally concerns the rights of a town in a navigable stream within its boundaries as contra to the rights of the State in such stream. Nor is a limitation period required to vest title to the river bed or minerals therein under the Small Bill. The ruling in the decisions concerning the Town of Refugio do not constitute a ruling upon the rights of the individuals here in issue.

This Court reviewed in detail the theory of the gradient boundary in Johnson v.

Phillips Petroleum Co., Tex.Civ.App., 257 S.W.2d 813, and a repetition of such theory in this opinion is unnecessary. The great weight and preponderance of the evidence supports the jury finding that the Salt Fork of Brazos River lies on the ground as shown by the survey of Colonel Stiles and Will Rounds as shown in Plaintiff's Exhibit No. 74. On this issue, it is noted that appellants assert that appellees failed to tie their gradient boundary to Sections One, Three and Five of the John Rodman Survey. There is no merit to this contention as it is a reasonable assumption that appellants will concede that the gradient boundary which they sought to establish by their surveyor, Simpson, was adequately tied to Sections One, Three and Five of the John Rodman Survey. Appellants admit in their brief:

"There is a vertical distance of 9/10ths of one foot between Rounds' gradient boundary and Simpson's gradient boundary, Simpson's being 9/10ths of one foot higher than Rounds'."

Thus it is readily apparent from appellants' own brief that if their gradient boundary as allegedly established by Simpson is adequately tied into Sections One, Three and Five, John Rodman Survey, then Rounds' gradient boundary is likewise tied into such sections as established by appellants' own admission.

As to all the lands in issue, including the river bed, it is here ruled that the Small Bill, Article 5414a, Vernon's Annotated Civil Statutes, clearly vested in the respective owners of the uplands on the Salt Fork of the Brazos River:

"the same rights, title and interest in the minerals in the beds or abandoned beds, or parts thereof, of such water courses or navigable streams, that they have in the uplands covered by the same patent or award; * *."

The above mineral interest was clearly vested by the act over and above the initial grant in Section 2 of the Article whereby the State quitclaimed and granted to

"* * * patentees and awardees and their assignees *all of the lands, and minerals therein contained,* lying across, or partly across watercourses or navigable streams, * * *." However, as asserted by the State, the Small Bill does not:

"* * * relinquish or quit-claim any number of acres of *land* in excess of the number of acres of land conveyed to said patentees or awardees in the original patents granted by the State * * *."

Since the Small Bill does not relinquish or quitclaim any number of acres of land in excess of the 640 acres as patented to each of the surveys in the original John Rodman Block if there is any excess acreage in the bed of the Salt Fork of Brazos River, such excess is owned by the State of Texas.

It must be determined whether excess acreage as to Sections One, Three and Five is found in the bed of the Salt Fork of Brazos River. The John Rodman Survey as to Sections One through Thirteen inclusive was originally surveyed by Louis C. Wise and as found by the jury such survey was made as one piece of work. Such Rodman Survey is principally bounded by senior surveys. The trial court in keeping with the facts located the John Rodman Block to contain 7,454.66 acres and not 8,320 acres as patented—the survey of thirteen sections is deficient to the extent of 865.4 acres. It was stipulated by the parties that the S.E. corner of Section One, Block Two, H. & G. N.; the N.W. corner of Section Twelve, Block One, H. & G. N.; and the N.E. corner of Section One, Rodman is a common point. Byron Simpson as a witness for the State of Texas made the following admission as to the Rodman Sections:

"Q. Each survey calls for another survey immediately ahead of it? A. Yes, sir.

"Q. Each survey is dependent upon the survey preceding it? A. Yes, sir.

"Q. And that survey is dependent upon the one ahead of it? A. Yes, sir.

"Q. All the way through the whole Rodman Block? A. Through the Rodman Surveys, yes, sir."

It is apparent from the record that all of the Rodman Sections were built and surveyed off of Section One, John Rodman by Louis C. Wise, the original Surveyor. It is an established legal principle that the footsteps of the original surveyor must control the location on the ground of the land conveyed by the patent. Only one original corner was established. In the absence of any testimony locating Wise's original corners as made on the ground, the presumption is that the survey ran the course and distances as called for in Wise's field notes and the burden of proof is upon appellants to rebut such presumption. Standefer v. Vaughan, Tex.Civ.App., 219 S.W. 484, at page 489. The Northeast corner of Section One, John Rodman was stipulated. "Where a corner or line is found marked, it is treated as influencing all other surveys in the block, even though the mark should have the effect to lengthen or shorten the distance called for in the other sections or changing the course called for. The surveyor or courts distribute the excess or loss proportionately to all other sections in the block up to the mark so established." Carmichall v. Stanolind Oil & Gas Co., Tex.Civ.App., 256 S.W.2d 129, writ refused; Wheeler v. Stanolind Oil & Gas Co., 151 Tex. 418, 252 S.W.2d 149; Schnackenberg v. State, Tex.Civ. App., 229 S.W. 934; State v. Sullivan, 127 Tex. 525, 92 S.W.2d 228; Tippett v. Woolley, Tex.Civ.App., 230 S.W.2d 283; Duval County Ranch Co. v. Rogers, Tex.Civ. App., 150 S.W.2d 880, at page 884; Stanolind Oil & Gas Co. v. State, 129 Tex. 547, 101 S.W.2d 801. Each survey in the Rodman Block contained 640 acres under Wise's survey or, at least, there was no excess acreage but rather a deficiency in acreage in the John Rodman Block. Such deficiency when distributed proportionately would create a deficiency in acreage in each section of the Block—including Sections One, Three and Five.

If any excess had existed in Sections One, Three and Five, which excess does not exist under the record, the respective owners of such sections are entitled to a deed of acquittance covering such excess. Article 5421c-1, Vernon's Texas Civil Statutes; Foster v. Duval County Ranch Co., Tex.Civ.App., 260 S.W.2d 103; Runnells County v. Gulf Oil Corporation, Tex. Civ.App., 209 S.W.2d 969; Cook v. Winter, Tex.Civ.App., 207 S.W.2d 145; Pollard v. Continental Oil Co., Tex.Civ.App., 162 S.W.2d 453.

No issue has been made on appeal as to any defect in the title of the respective appellees' as to the uplands as a whole of the Maben land in Survey One, the Stewart land in Surveys Three and Five north and west of the river and the Wood land in Surveys Three and Five south of the river. Appellants' contention concerning these tracts is that they own the river bed and minerals thereunder as well as little strips and gores of land along the river banks adjoining the respective tracts as created by a survey along this river bank. Appellants' contentions are without merit under the following principles of law. As to the Maben tract in Survey One there can be no sound basis whatsoever for appellants' contention that such survey is bounded by meandering survey lines rather than the river on the east side thereof. W. W. Barron, appellants' quitclaim grantor, originally conveyed to R. G. Maben, Jr., by warranty deed the South half of Section One of the John Rodman Survey which deed contains the following description of the east boundary of such land:

"Thence *following the left bank of said river* to a point on a line dividing Section No. 1, John Rodman Survey into two parts known as the North and South half, the *following are the meanderings of the left bank of said river * * *.*"

This description beyond question places the east boundary of the Maben tract within

the rule found in Stover v. Gilbert, Tex. Com.App., 112 Tex. 429, 247 S.W. 841, 843:

"It is a rule of general acceptation that meander lines of surveys of land adjacent to or bounding upon a stream are not to be considered as boundaries, but they are to follow the general course of the stream, which in itself constitutes the real boundary."

The east boundary of the Maben uplands in Survey One is the bank of the Salt Fork of Brazos River. Stover v. Gilbert, supra; Johnson v. Phillips Petroleum Co., Tex.Civ.App., 257 S.W.2d 813; McCombs v. McKaughan, Tex.Civ.App., 195 S.W.2d 194; State v. Atlantic Oil Producing Co., Tex.Civ.App., 110 S.W.2d 953; 11 C.J.S., Boundaries, § 30 a and b, pages 572–573.

That part of Sections Three and Five lying North and West of the Salt Fork of Brazos River and known as the Stewart land and that part of Sections Three and Five lying south of the Salt Fork of Brazos River and designated as the Wood land are governed by the same principle of law as cited in the paragraph above. The meander lines are not to be considered as the boundaries of said tracts but merely show the course of the Salt Fork of Brazos River which in itself constitutes the real boundary of each tract.

The Maben, Stewart and Wood lands as bounded by the Salt Fork of Brazos River were conveyed to the respective owners by W. W. Barron prior to the passage of the Small Bill, Art. 5414a, supra. On the date of the passage of the Small Bill the respective grantees were the owners of the uplands in each tract as bounded by the river. Under the Small Bill, and the agreement of the respective appellees that the title to lands bounded by the river extended to the center line thereof, the West, North and South half of the Salt Fork of Brazos was vested in the respective owners of the uplands bounded by the river and as fixed by the judgment of the trial court. Article 5414a, Vernon's Texas Civil Statutes; Stover v. Gilbert, supra; and au-

thorities cited above. The State of Texas v. Parker, 61 Tex. 265; Baylor v. Tillebach, 20 Tex.Civ.App. 490, 49 S.W. 720; Cagle v. Sabine Valley Timber & Lumber Co., 109 Tex. 178, 202 S.W. 942, 6 A.L.R. 1426; Chouke v. Filipas, Tex.Civ.App., 10 S.W.2d 807, affirmed 120 Tex. 508, 40 S.W. 2d 38; Langdeau v. Hanes, 21 Wall. 521, 88 U.S. 521, 22 L.Ed. 606; Elliott v. Nelson, Tex.Com.App., 113 Tex. 62, 251 S.W. 501.

There is no controversy as to that part of Survey Five designated as owned by the Jones Estate and leased to General Crude Oil Company and Continental Oil Company and extending to the banks of the Salt Fork of Brazos River. That part of Survey Five is defined by deed of conveyance as "* * * Survey No. 5, lying East of the Salt Fork of the Brazos River * * *." This description extends Survey Five to the east bank of the river as to the uplands. It is undisputed that those portions of Surveys One and Three lying east of the river and adjoining Sections Five and Twelve were a part of the "Boley Brown Ranch," and also designated as W. W. Barron Ranch. It is likewise revealed by a certified copy of the resolution of the Board of Directors of the Chicago Livestock Loan Company and by contract of sale of the company that Percy Jones as Independent Executor of the Morgan Jones Estate made an offer to purchase from the Chicago Livestock Loan Company 12,884.56 acres of land situated in Kent County, Texas:

"* * * and being known as the Boley Brown Ranch, at a consideration of $77,306.16, to be paid all in cash, with said Percy Jones, Executor, to receive a general warranty deed to said property free and clear of all liens and encumbrances, * * *."

Such resolution of the Board of Directors of the Chicago Livestock Loan Company and sale contract constituted an executory contract to sell the "Boley Brown Ranch" also designated and "recently known as the W. W. Barron Ranch" as stipulated in the resolutions and contract. This con-

tract covered the small tract consisting of approximately 12.21 acres of land in Sections One and Three east of the river and the east half of the river bed as such tracts were unquestionably a part of the Boley Brown Ranch also known as the W. W. Barron Ranch as described in the above resolutions or contract. Appellee, Jones Estate, was likewise conveyed the 12.21 acre tract of land under the principles hereinafter discussed but under the above resolutions and contract the Jones Estate received equitable title to the 12.21 acre tract of land in issue and the river bed as within the Bowley Brown Ranch as described in the contract. The record is undisputed that the Jones Estate paid for such lands and the equitable title as received by them under such sale contract upon payment of the agreed consideration would support their plea in trespass to try title. Atteberry v. Burnett, 102 Tex. 118, 113 S.W. 526, 528:

"The trust in this case is similar to that which exists in the vendor under an executory contract for the sale of land after the purchase money has been paid. In such case the vendor holds the legal title in trust for the vendee, * *. In each the vendor is wholly divested of the equitable title to the land, * *. The vendor could not terminate this trust by *conveying the land to another,* nor by purchasing the equitable title."

Gilmore v. O'Neil, 107 Tex. 18, 173 S.W. 203; Johnson v. Wood, Tex.Com.App., 138 Tex. 106, 157 S.W.2d 146; Pickle v. Whitaker, Tex.Civ.App., 224 S.W.2d 741; Sinkey v. Temple Lumber Co., Tex.Civ. App., 131 S.W.2d 809; McGowen v. Montgomery, Tex.Civ.App., 248 S.W.2d 789; Elliott v. Nelson, Tex.Com.App., supra.

The following principles of law further support the title of the appellees, Jones Estate. Since the appellees purchased the Boley Brown Ranch consisting of 12,884.36 acres of land as situated in Kent County, such conveyance carried with it the two small strips of land consisting of 12.21 acres of land and lying east of the river in Sections One and Three and adjoining Sections Five and Twelve and a part of the Boley Brown Ranch. Such narrow strip was conveyed by operation of law. Cantley v. Gulf Production Co., 135 Tex. 339, 143 S.W.2d 912; Dawson v. Hickman, Tex.Civ.App., 95 S.W.2d 1319, error refused; State v. Arnim, Tex.Civ.App., 173 S.W.2d 503; Haines v. McLean, Tex., 276 S.W.2d 777.

A specific provision of the deed delivered by Chicago Livestock Loan Company to the Jones Estate also vested title to the small strip of land in the Jones Estate. The undisputed record reveals that the deed to the Jones Estate contains the following provision:

"The above described tracts of land containing a total of 12,884.36 acres, and are *fully described in a plat and field notes made by W. A. Riney, Surveyor,* on the ground and certified to by him on November 18, 1935; said plat, with the field notes thereon, being on file in the County Clerk's office of Kent County, Texas, *and reference is made to same.*"

This plat by Riney as referred to reveals clearly that the 12.21 acre tract of land in Surveys One and Three east of the river was included within the bounds of the survey as made by him along the Salt Fork of Brazos River and the deed incorporating the survey vested title to such small tract in the Jones Estate. The map as incorporated herein is a photostatic copy of the Riney plat as to the lands here in issue and clearly reveals the survey line as enclosing the 12.21 acre tract.

The title of the Jones Estate in Sections One, Three and Five, as a matter of law, extends to the center of the Salt Fork of Brazos River as it crosses Section One, Northeast corner of Section Three and Section Five. W. W. Barron was the owner of the uplands adjoining the east bank of the river in such sections at the time of the passage of the Small Bill. Under such Bill, Article 5414a, supra, Barron received title to the East half of the bed of the river and minerals thereunder.

Since the river was a statutory navigable stream and title was divested out of the State by the Small Bill and vested in the owner of the uplands, there no longer existed any legal impediment to extending the lines of survey to the center of the river as the boundary of Sections One, Three and Five east of the river. Upon the termination of State ownership, no sound principle requires that a distinction be made as to boundary lines entering a statutory navigable stream such as that in issue here and as to boundary lines entering a non-navigable stream. Moore v. Ashbrook, Tex.Civ.App., 197 S.W.2d 516, writ refused. Also Jones' sale contract included the area.

A further principle of law reveals title vested in the respective appellees as to their tracts of land in issue. The State of Texas in this cause of action nowhere questions the validity of the patents or that such patents were issued as to Surveys One, Three and Five as located on the ground and crossing and covering the bed of the river. Nor does the State question appellees' titles to the minerals in the river bed but only seeks to recover the alleged excess acreage and minerals thereunder. The Strayhorn, Stringer appellants contend, in essence, that since the patents to the tracts cross the river bed such patents are void. The patents crossing the river bed in the various surveys vested legal title to the tracts in the patentee and such title is now vested in the appellees and is subject to attack solely by the State of Texas. Appellants' attack on appellees' titles is without merit under such established rule of law. O'Keefe v. Robison, 116 Tex. 398, 292 S.W. 854; Bunnell v. Sugg, Tex.Civ. App., 135 S.W. 701; Fitzgerald v. Robison, 110 Tex. 468, 220 S.W. 768.

Some of the appellees have filed counter-assignments of error. One of these assignments alleges error of the trial court in refusing to receive in evidence the bankruptcy schedule of W. W. Barron and his testimony in bankruptcy proceedings to the effect that he had disposed of all the lands here in controversy. Appellants are claiming under a quitclaim deed from W. W. Barron and it would not have been error for the court to admit the evidence as sought to be introduced by appellees. The second counter-assignment asserts the court erred in refusing to sustain appellees' objections to certain issues submitted with reference to whether there was an agreement as to boundary lines between certain of the parties. The issues as submitted by the court are subject to some of the objections raised by appellees, Texas Gulf Producing Company and Frank Stewart. But, both of these counter-assignments become immaterial in view of the disposition of the cause as herein made.

Gilcrease Oil Company has filed a memorandum of authorities and an argument on behalf of the appellants for consideration by this Court. As to the subject matter of such argument, one of the titles is dubbed "The Moral Issue" and the same follows a presentation of like material in the briefs filed by Strayhorn, Stringer et al. In appellants' argument with reference to appellees' statement of the fact that W. W. Barron had paid no taxes on the lands in issue is found the following and like allegations:

"That argument sounds quite deflated to the writer upon noting the complete failure of W. W. Barron, as shown by the petition of the Chicago Cattle Loan Company, above-mentioned, and noting in connection therewith that Mr. Jones had $77,000.00 all in cash in his pocket and all at one time in 1935, one of the hardest years of the depression!"

Expressions by Strayhorn, Stringer et al. as to the Jones Estate trying to obtain Mr. Barron's land as a donation, and allegations of similar import as to Maben, Stewart and Wood seeking to commit like acts of appropriation of lands formerly owned by Barron, together with above allegation, were apparently placed in the appellants' briefs in the thought that this Court, in a burst of pure sentiment, might divest title out of appellees as to all the lands in controversy. But such allegations of appellants, to borrow an expression from Gilcrease, "sound quite deflated." First,

the undisputed record reveals that Wood, Maben and Stewart did not appropriate Barron's lands but purchased the same from W. W. Barron in 1924 and 1925, paid the consideration as agreed upon, received a warranty deed and have been in possession of such lands since that date. So far as the record reveals, apparently appellants' first claim as to any of the land sprang from the quitclaim deed which they obtained from W. W. Barron on August 28, 1950 and after oil was discovered on the lands. The record also reveals, without dispute, that Mr. Jones with his $77,000 did not take W. W. Barron's land from him in 1935, "one of the hardest years of the depression," or at any other time. The Jones Estate likewise did not take such lands from Barron in 1935 or on any other date as the undisputed record reveals that legal or equitable title in and to Sections One, Three and Five east of the river and other lands therewith vested in Chicago Livestock Loan Company on April 5, 1932 under a foreclosure of lien suit as filed against Barron by such company. Incidentally, appellants' righteous indignation over their theory of the Jones Estate profiting from Barron's financial demise has closed their eyes to the fact that they, the appellants, on December 30, 1948 took a quitclaim deed from Chicago Livestock Loan Company—the same corporation that actually took W. W. Barron's lands from him by foreclosure in 1932 and thereafter sold the same to the Jones Estate. However, lest the Court become too engrossed with the fate of Barron, it is well to recognize that W. W. Barron himself was not too imbued with appellants' theory that his succumbing financially to the depression in 1932 vested him with "The Moral Issue" which entitled him, or his quitclaim grantees, to take the old homestead, with oil wells, some twenty or thirty years later. W. W. Barron in 1950, by quitclaim deed to the appellants, parted with all his claims to the lands in issue for the record price of ten dollars.

However unique it may be to find a corporate appellant harrowing the tender sensibilities of this Court over an individual who had $77,000 in his pocket in 1935, "one of the hardest years of the depression," the Court will not further concern itself with the financial fate of Barron. Appellants' argument resolves itself into the theory that the financial failure of Barron *in 1932,* for $10 paid on August 28, 1950 by appellants Strayhorn, Stringer et al. vested such appellants with "The Moral Issue" which they argue to this Court now entitles them to appropriate small strips and gores out of the lands of the appellees as well as the river bed of the Salt Fork of Brazos River. The land in issue has been unitized as to oil production and no further wells will be drilled thereon. Any small strip or gore as sought by appellants could merely constitute a measuring vessel of the oil appellants seek to obtain out of production now existing on the lands of appellees.

"The Moral Issue" as presented by the briefs of the appellants and Gilcrease has been reviewed at the special instance of appellants and in the light of the entire record. But, the Court has been enabled to bravely put aside any tender sentimentality engendered on behalf of the appellants who eased the 1932 financial plight of W. W. Barron with $10 paid in 1950 and thereby became invested by quitclaim deed with financial memories of the great depression. Under the law and the facts in the cause as above detailed, the Court has formed the opinion that the lands and minerals in issue should be wholly vested in the appellees as decreed by the trial court. Accordingly, all points of error are overruled and the judgment of the trial court is affirmed.