ACCEPTED
03-14-00198-CV
4356321
THIRD COURT OF APPEALS
AUSTIN, TEXAS
3/3/2015 4:04:06 PM
JEFFREY D. KYLE
CLERK

**No. 03-14-00198-CV**

IN THE THIRD COURT OF APPEALS
at AUSTIN, TEXAS

**CITY OF NEW BRAUNFELS, TEXAS,**

*Defendant-Appellant*

v.

RECEIVED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
3/3/2015 4:04:06 PM
JEFFREY D. KYLE
Clerk

**STOP THE ORDINANCES PLEASE, W.W. GAF, INC., d/b/a ROCKIN "R" RIVER RIDES, TEXAS TUBES, TOURIST ASSOCIATED BUSINESSES OF COMAL COUNTY; UNION RIVER LLC d/b/a LANDA RIVER TRIPS; CHUCK'S TUBES; WATERPARK MANAGEMENT, INC.; TRI-CITY DISTRIBUTORS, LP and STONE RANDALL WILLIAMS,**

*Plaintiffs-Appellees*

Appeal from the 207th District Court of Comal County, Texas
Cause No. C2007-0387B

**BRIEF OF *AMICI CURIAE* IN SUPPORT OF APPELLANT**

William G. Bunch
State Bar No. 03342520
bill@sosalliance.org
Kelly D. Davis
State Bar No. 24069578
kelly@sosalliance.org
Save Our Springs Alliance
905 W. Oltorf St., Ste. A
Austin, Texas 78704
T: 512-477-2320
F: 512-477-6410

**Attorneys for *Amici Curiae* the Texas Rivers Protection Association, San Marcos River Foundation, Greater Edwards Aquifer Alliance, and Save Our Springs Alliance**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES...................................................................................................ii

I. AMICUS DISCLOSURE.................................................................................................1

II. BACKGROUND..............................................................................................................1

    A.   The Comal and Guadalupe Rivers....................................................................1

    B.   *Amici's* Interests.................................................................................................3

III. ARGUMENT....................................................................................................................6

    A.  Appellants have failed to meet their burden of showing, with unmistakable clarity, that the legislature intended to preempt the ordinances..........................................................................................................6

    B.  The Ordinances are a valid exercise of the City's police power because they protect the public health, safety, and welfare...................................8

    C.  Evidence in the record shows that the Ordinances have the intended effect of curbing trash in the Rivers..........................................................10

    D.  Home-rule authority must be preserved to ensure issues are addressed effectively and with community input......................................................12

    E.  The Ordinances are a valid exercise of the City's police powers over navigable waters and are not preempted by the Texas Constitution nor the Texas Parks and Wildlife Code...................................................................15

    F.  Texas Local Government Code § 551.002 provides further support that the Ordinances are a valid exercise of the City's police power.................19

IV. CONCLUSION...............................................................................................................21

CERTIFICATE OF COMPLIANCE....................................................................................22

CERTIFICATE OF SERVICE.............................................................................................23

# INDEX OF AUTHORITIES

**CASES**

*Carrithers v. Terramar Beach Cmty. Imp. Ass'n, Inc.*, 645 S.W.2d 772 (Tex. 1983)...................................................................................................18, 18 n.5

*City of Brookside Vill. v. Comeau*, 633 S.W.2d 790 (Tex. 1982).............7, 9, 13, 14

*City of Houston v. Bates*, 406 S.W. 3d 539 (Tex. 2013)...................................7, 21

*City of Sherman v. Mun. Gas Co.*, 127 S.W. 2d 193 (Tex. 1939).....................6 n.2

*City of Waxahachie v. Watkins*, 275 S.W. 2d 477 (Tex. 1955)...............................8

*Dallas Merch.'s & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489 (Tex. 1993)....................................................................................................6, 7

*Diversion Lake Club v. Heath*, 86 S.W. 2d 441 (Tex. 1935).........15, 15 n.4, 16, 18

*Edge v. City of Bellaire*, 200 S.W. 2d 224 (Tex. Civ. App.—Galveston 1947, writ ref'd)....................................................................................................9

*Gorieb v. Fox*, 274 U.S. 603 (1927).....................................................................13

*Guadalupe-Blanco River Auth. v. Pitonyak*, 84 S.W. 3d 326 (Tex. App.—Corpus Christi 2002, no pet.).................................................................................16, 17

*Heard v. Town of Refugio*, 103 S.W. 2d 728 (Tex. 1937)....................................18

*Hunt v. City of San Antonio*, 462 S.W.2d 536 (Tex. 1971)....................................7

*In re Sanchez*, 81 S.W. 3d 794 (Tex. 2002)........................................................21

*Int'l Ass'n of Fire Fighters, Local 1173  v. City of Baytown*, 837 S.W.2d 783 (Tex. App.—Houston [1st Dist.] 1992, writ denied).....................................................7

*Lower Colo. River Auth. v. City of San Marcos*, 523 S.W.2d 641 (Tex. 1975).........6

*Proctor v. Andrews*, 972 S.W. 2d 729 (Tex. 1998)..............................................6

*Selman v. Wolfe*, 27 Tex. 68 (1863)...............................................................17

*STOP v. City of New Braunfels*, 306 S.W. 3d 919 (Tex. App.—Austin 2010, no pet.)...............................................................................................................14

*Tex. River Barges v. City of San Antonio*, 21 S.W. 3d 347 (Tex. App—San Antonio 2000, pet. denied)..........................................................8-9, 15, 17, 18

*Welder v. State*, 196 S.W. 868 (Tex. Civ. App.—Austin 1917, writ ref'd).....18 n.5

## STATUTES AND CITY ORDINANCES

Tex. Health & Safety Code § 361.0961...........................................................20

Tex. Loc. Gov't Code § 551.002.........................................................19, 20, 20 n.6

Tex. Parks & Wild. Code § 1.011(c)................................................................15

New Braunfels, Tex., Code ch. 86, art. I, § 86-14(1) (2014) ("Cooler Ordinance").......................................................................................passim

New Braunfels, Tex., Code ch. 86, art. I, § 86-14(2) (2014) ("Disposable Container Ordinance").....................................................................passim

Austin, Tex., Code of Ordinances, Title 6, ch. 6-6, § 6-6-2................................13

## CONSTITUTIONAL & CHARTER PROVISIONS

Tex. Const., art. XI, § 5.................................................................................6

Tex. Const. art. XVI, § 59..............................................................................15

New Braunfels City Charter § 2.01..................................................................8

## ADDITIONAL SOURCES

THE TEXAS ALMANAC ONLINE, *available at* www.texasalmanac.com........................1-3

TEXAS STATE HANDBOOK ONLINE, *available at*
www.tshaonline.org/handbook/online........................................................1-3

Texas Municipal League, *Handbook for Mayors and Councilmembers* (2013
ed.)...................................................................................................6

6A EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 24.10 (3rd ed.
1984)..................................................................................................9

Greg Bowen, *Holiday Garbage up 438 Percent*, NEW BRAUNFELS HERALD-ZEITUNG,
July 2, 2014............................................................................................11

Asher Price, *Researchers Find Carcinogen Dropoff in Lady Bird Lake Following
Ban*, AUSTIN AMERICAN-STATESMAN, June 16, 2014...............................14

Tex. Comm'n on Envtl. Quality, *Gem Seal of Tex., Inc. v. City of Austin*, Docket
No. 2006-0056-MIS, Exec. Dir.'s Reply Br. (May 25, 2007)..........................13, 14

# I. AMICUS DISCLOSURE

This brief is tendered on behalf of *amici curiae* the Texas Rivers Protection Association, San Marcos River Foundation, Greater Edwards Aquifer Alliance, and Save Our Springs Alliance, Inc. The Texas Rivers Protection Association made a donation to Save Our Springs Alliance to help cover the Alliance's costs of preparing this brief. *See* Tex. R. App. P. 11(c).  The remainder of costs for preparation was covered by general donations to the Save Our Springs Alliance from individuals, businesses, and foundations.

# II. BACKGROUND

A. The Comal and Guadalupe Rivers[1]

The Comal River is the shortest river in Texas, at two-and-a-half miles, and is contained entirely within the City of New Braunfels.  As a spring-fed river, the Comal begins at Comal Springs in Landa Park and flows southeast through New Braunfels until it empties into the Guadalupe River.  The Comal Springs—the largest springs in Texas and the American Southwest—are located in New Braunfels's Landa Park, a popular picnic and recreation spot

---

[1] The information in this section comes from first-hand knowledge of the rivers, as well as the following sources: THE TEXAS ALMANAC ONLINE, www.texasalmanac.com, and the TEXAS STATE HANDBOOK ONLINE, www.tshaonline.org/handbook/online , both published by the Texas State Historical Association, articles on "Comal Springs," "Secondary Streams of Texas," "Comal County," "Guadalupe River,"  and "New Braunfels."  Last accessed  Feb. 25, 2015.

1

since the 1860's and the home of seventy-six species of trees, including several ancient live oaks.

Unsurprisingly, the clear water emanating from the springs has attracted people to the area for hundreds of years. These springs were a favorite camping place for native Indian tribes, and many artifacts and burial mounds have been found. In the mid-1800's, German pioneers established the City of New Braunfels (the City), which soon became the new German center for Texas. These industrious settlers began harnessing the Comal Springs for power, and the German heritage of the area is still celebrated today.

The Comal River is one of three major tributaries to the Guadalupe River, with their juncture in the middle of town. Although the Guadalupe is quite a bit larger, at 409 miles, it holds historic significance for the City as the site of one of the earliest Franciscan missionaries. It is difficult to overstate the rivers' contribution to New Braunfels's quality of life and economic prosperity.

Today, the Comal and Guadalupe Rivers support a variety of recreational activities, including fishing, swimming, river tubing, rafting, kayaking, and driving along scenic river parkways. The popular water park resort Schlitterbahn's sole source of water is the Comal River, and the nearby Comal Baths have been the site of city-conducted swimming lessons since

1900. The Guadalupe River hosts the primary trout fishery in the state, supporting a thriving sport-fishing industry that relies on the health of the ecosystem. Because of the rivers' beauty and popularity as a recreation area, owners of riverfront properties may choose to rent their property out to tourists, use it as a vacation home, or live there with full-time access to the river. In addition to their economic and recreational value, the Comal and Guadalupe Rivers support a variety of plant and animal life unique to Central Texas' spring-fed rivers. With so much to see and do, it is easy to see why each year thousands of tourists come to enjoy New Braunfels and its rivers. Among those with a strong interest in keeping Texas rivers clean are the four *amici curiae* represented in this brief.

B. Amici's Interests

As organizations concerned with the ecological integrity and economic, recreational, cultural, and aesthetic value of the waterways that mark the Texas Hill Country, *amici curiae* have a fundamental interest in ensuring that home-rule cities and their citizens maintain the authority to legislate at the local level for the purposes of protecting water quality and decreasing pollution for the benefit of all people.

The Texas Rivers Protection Association (TRPA) is a non-profit organization led by pro-river volunteers across the State representing

3

landowner coalitions, conservationists, canoe and kayak clubs, and fishing associations. Its members represent a broad and diverse cross-section of conservation and recreation groups and individuals with a common concern for the quality of Texas's natural rivers. TRPA's mission is to protect the flow, water quality, and natural beauty of the rivers of Texas, promote awareness of the rights of the public and riparian landowners and foster a mutual respect, educate members and the public about conserving Texas rivers, and acquire property and easements to provide access to rivers.

The San Marcos River Foundation (SMRF) is a non-profit formed in 1985 by San Marcos citizens, riverside landowners, the San Marcos Lions Club, and other civic groups with a mission to preserve public access to the San Marcos River and protect the flow, natural beauty, and purity of the river and its watershed for future generations. SMRF works toward this goal with educational events, river cleanups, purchasing riparian land, and water-quality testing.

The Greater Edwards Aquifer Alliance (GEAA) is an organization dedicated to protecting and preserving the Edwards Aquifer and the Hill Country's scenic beauty and cultural heritage for the benefit of all residents, especially the 1.5 million Texans who rely on the Aquifer for drinking water. Its members include citizen-based conservation groups as well as groups from

the religious, business, and historic preservation communities, stretching from Del Rio to Austin. GEAA groups work locally with a common commitment to education and action based on sound science and sustainable economic principles.

Save Our Springs Alliance, Inc. is a non-profit, charitable organization dedicated to the preservation of the Edwards Aquifer, its springs and contributing streams, and to the natural and cultural heritage of the Hill Country region, with a special emphasis on Barton Springs.

Consistent with the mission of these organizations, *amici* support New Braunfels's authority to enact the ordinances at issue here. These public health and safety ordinances help preserve the economic, cultural, spiritual, recreational, and ecological value of the Comal River and that portion of the Guadalupe River within the City's jurisdiction. Maintaining the purity and safety of these majestic ecosystems through local regulation will enhance the public's use and enjoyment of these rivers within the City. Given the current water shortages facing the State, Texas cities are challenged to exercise their traditional home-rule powers in ways necessary to protect and sustain their local and increasing threatened water resources. *Amici curiae* thus have a legal interest in upholding a home-rule city's authority to enact ordinances designed to protect rivers within municipal boundaries. Beyond regulations

5

focusing on environmental protection, *amici* also have a legal interest in preserving the principle of home rule, which has been defined as "the right of citizens at the grassroots level to manage their own affairs with minimum interference from the state." Texas Municipal League, *Handbook for Mayors and Councilmembers*, at 8 (2013 ed.).

### III. ARGUMENT

A. **Appellants have failed to meet their burden of showing, with unmistakable clarity, that the legislature intended to preempt the ordinances.**

The City of New Braunfels, and all Texas home-rule cities, derive their powers from the Texas Constitution. *See* Tex. Const. art. XI, § 5; *Proctor v. Andrews*, 972 S.W. 2d 729, 733 (Tex. 1998). Home-rule cities "possess the full power of self government and look to the Legislature not for grants of power, but only for limitations on their power." *Dallas Merch.'s & Concessionaire's Ass'n v. City of Dallas*, 852 S.W. 2d 489, 490-91 (Tex. 1993). Accordingly, Texas home-rule cities have "broad discretionary powers," and, absent legislation or constitutional provisions to the contrary, "a home rule municipality is free to regulate itself in any manner it chooses."[2] *Id.* at 490; *Lower Colo. River Auth. v. City of San Marcos*, 523 S.W.2d 641, 643 (Tex. 1975).

---

[2] In contrast, counties and general law cities have only those powers prescribed by the legislature by general law. *City of Sherman v. Mun. Gas Co.*, 127 S.W. 2d 193, 196 (Tex. 1939).

The legislature may limit the power of home-rule cities either expressly or by implication, but the legislature's intent to limit such powers must appear with "unmistakable clarity." *City of Houston v. Bates*, 406 S.W. 3d 539, 546 (Tex. 2013) (*citing Dallas Merch.'s*, 852 S.W. 2d at 491). When a home-rule city ordinance is alleged to conflict with a state statute, a court's duty is to reconcile the two "if any fair and reasonable construction of the apparently conflicting enactments exist[s] and if that construction will leave both enactments in effect." *Int'l Ass'n of Fire Fighters, Local 1173 v. City of Baytown*, 837 S.W. 2d 783, 787 (Tex. App—Houston [1st Dist.] 1992, pet. denied).

This "unmistakable clarity" test and its corollary—that a home-rule city ordinance be upheld whenever there is "any fair and reasonable construction" of the ordinance and a state law alleged to be in conflict with the ordinance "that will leave both enactments in effect"—control the outcome of this case.

In applying this test, courts are hesitant to limit the authority granted to home-rule cities by the Texas Constitution. *Hunt v. City of San Antonio*, 462 S.W.2d 536, 539 (Tex. 1971). In reviewing a challenge to a municipality's regulatory action, a court's role is "necessarily circumscribed as appropriate to the line of demarcation between legislative and judicial functions." *City of Brookside Vill. v. Comeau*, 633 S.W. 2d 790, 792 (Tex. 1982). A city ordinance is presumed to be valid, and courts have no authority to interfere with matters

7

of municipal government unless a charter provision or ordinance enacted thereunder is shown to be "unreasonable and arbitrary—a clear abuse of municipal discretion." *Id.* Therefore, a party challenging an ordinance bears an "extraordinary burden" of establishing that "no conclusive or issuable fact or condition existed" which would authorize a city's enactment of the ordinance. *Id.* at 792-93. If the evidence before the court reveals an issuable fact in this respect, such that reasonable minds may differ as to whether a particular ordinance is reasonable, the ordinance must stand as valid. *Id.* at 793. In making this assessment, a court must give "due regard to all circumstances of the city, the object sought to be attained, and the necessity existing for the ordinance." *City of Waxahachie v. Watkins*, 275 S.W. 2d 477, 481 (Tex. 1955).

## B. The Ordinances are a valid exercise of the City's police power because they protect the public health, safety, and welfare.

Pursuant to its police power, New Braunfels has the authority to enact the Ordinances. The New Braunfels City Charter expressly declares that the City "shall have all powers possible for a home rule city to have under the constitution and laws of the State of Texas as fully and completely as though they were specifically enumerated in this charter." City Charter, § 2.01. This provision incorporates the police power as a power of the City. *See Tex. River*

8

*Barges v. City of San Antonio*, 21 S.W. 3d 347, 355 (Tex. App—San Antonio 2000).

An ordinance is a valid exercise of a city's police power if the regulation was adopted to accomplish a legitimate goal, that is, it has a "substantial relationship" to the protection of the public's general health, safety, or welfare. *Comeau*, 633 S.W. 2d at 793. Although the exact parameters of the police power are difficult to define, courts have found it useful to think of it as the "power to anticipate and prevent dangers and to protect the inhabitants of a community, and in so doing, to restrain individual tendencies." *Tex. River Barges*, 21 S.W. 3d at 355 (citing 6A EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 24.10 (3rd ed. 1984)). Further, "if there is an issuable fact as to whether the ordinance makes for the good of the community, the fact that it may be detrimental to some private interest is not material in assessing an ordinance's validity." *Id.* (citing *Edge v. City of Bellaire*, 200 S.W. 2d 224, 227 (Tex. Civ. App.—Galveston 1947, writ ref'd)).

Here, the Ordinances are a valid exercise of the City's police powers and are not unreasonable or arbitrary. The City enacted the Ordinances to address pollution and litter problems specific to the Comal River and that short piece of the Guadalupe River within the City's jurisdiction. New Braunfels., Tex., Code ch. 86, art. I, §86-14. The goal of the Ordinances is to protect the public

9

health and welfare by restricting within the Rivers certain containers that result in large amounts of trash ending up in the Rivers. Preventing the pollution and degradation of the Rivers bears a substantial relationship to the public health, safety, and general welfare. The fact that individuals are restrained from doing whatever they want on the Rivers, or that Appellees suffer reduced revenues, does not render the Ordinances an abuse of municipal discretion.

### C. Evidence in the record shows that the Ordinances have the intended effect of curbing trash in the Rivers.

In enacting the Ordinances, the City government was reacting to concerns particular to the City—trash and pollution in the Guadalupe and Comal Rivers within its borders. Evidence in the record concerning the amount of trash in the Rivers prior to the Ordinances' enactment demonstrates the need to regulate activities that result in such pollution. In its legislative findings, the City Council set forth the problems it intended to address through the Ordinances.

In his deposition, the Manager of the City's Solid Waste Division noted, **"the City has experienced a significant reduction in the amount of trash** and litter that was collected and accounted for the years 2012 and 2013 in comparison to year 2011." Michael Mundell Aff., attached to Def.'s Resp. to

10

Pls.'s Mot. Entry of Final J., filed Feb. 7, 2014) (attached as Ex. A). After becoming effective on January 1, 2012, the Disposable Container Ordinance greatly contributed to the reduction in trash found in the rivers during the years 2012 and 2013. Most astonishingly, the Comal River alone yielded **97 tons of trash and litter in 2011** before the enactment of the Disposable Container Ordinance. The amount of trash and litter collected from the Comal River overwhelmingly decreased—with **24 tons in 2012** and **34 tons in 2013**—after the enactment of the Disposable Container Ordinance. Thus, the City collected 75% and 65% less trash and litter from the Comal River, respectively, in years with the Ordinance in effect compared to without. Mundell Aff. The record shows not only that the City was facing a serious problem of trash in the Rivers, but also that the Ordinances serve the intended purpose of decreasing pollution and trash in the Comal River and New Braunfels's piece of the Guadalupe.

Following the trial court's ruling granting summary judgment for Appellees and enjoining the Ordinances, the amount of trash and litter collected from the Comal River drastically increased by 438% during the 2014 Memorial Day weekend in comparison to the 2013 Memorial Day weekend. Greg Bowen, *Holiday Garbage up 438 Percent*, NEW BRAUNFELS HERALD-ZEITUNG, July 2, 2014 (attached as Ex. B). These data, reported in the City of New

Braunfels's River Services Update, show the amount of trash collected was significantly higher when the Ordinances were not in effect. Prohibiting behaviors that lead to more trash ending up in the rivers protects the public health and promotes the general welfare. Thus, adequate governmental interests are served by regulating the amount and type of disposable materials being brought in to the Rivers. At a minimum, these data present an "issuable fact" over whether the regulations are reasonably related to a legitimate governmental interest. The Ordinances, therefore, must stand as a valid exercise of the City's police power.

### D. Home-rule authority must be preserved to ensure local conditions are addressed effectively and with community input.

The City's enactment of the Ordinances as a response to the problem of huge amounts of trash in the Rivers highlights the importance of home rule. Home rule assumes that governmental problems should be solved at the lowest level possible, closest to the people, with limited reach and addressing local conditions. Local governing bodies are most in tune with the particular issues that face their jurisdictions and can tailor regulations most apt to resolve those local issues. Courts have repeatedly acknowledged the judiciary's limited role in disturbing local enactments unless clearly

unreasonable. This principle is embodied in judicial recognition of the importance of local government's zoning power:

> State legislatures and city councils, who deal with the situation from a practical standpoint, are better qualified than the courts to determine the necessity, character, and degree of regulation which these new and perplexing conditions required; and their conclusions should not be disturbed by the courts unless clearly arbitrary and unreasonable.

*Gorieb v. Fox*, 274 U.S. 603, 608 (1927). Similarly, localized pollution problems such as the unique circumstances found on the Comal River and that short stretch of the Guadalupe within the City are best addressed at the local level.

The Texas Supreme Court has upheld an ordinance regulating the placement of mobile homes, noting that the regulations were important to preserving public health and property values in the municipality because of the unique conditions presented there. *Comeau*, 633 S.W. 2d at 795. Another example is provided by the City of Austin's ordinance prohibiting a type of pavement sealant. Austin, Tex., Code of Ordinances, Title 6, ch. 6-6, §6-6-2. In 2003, Austin officials singled out parking lot sealants as a likely source of hydrocarbon pollution in Austin's lakes and creeks. Tex. Comm'n on Envtl. Quality, *Gem Seal of Tex., Inc. v. City of Austin*, Docket No. 2006-0056-MIS, Exec. Dir.'s Reply Br. at 2 (May 25, 2007). Austin banned the sealants in 2006, and

13

studies recently conducted showed a 58% decline in the pollutant, which is toxic to aquatic life and a likely carcinogen. Asher Price, *Researchers Find Carcinogen Dropoff in Lady Bird Lake Following Ban*, AUSTIN AMERICAN-STATESMAN, June 16, 2014 (attached as Ex. C). In a challenge to the ban before the Texas Commission on Environmental Quality, Austin's authority to adopt ordinances to protect water quality was upheld. *Id.*; *Gem Seal of Tex., Inc. v. City of Austin*, Exec. Dir.'s Reply Br. at 2.

Like the cities of Brookside Village and Austin, New Braunfels's authority to adopt ordinances addressing the unique issues facing the City should be upheld. As this Court previously acknowledged, New Braunfels officials became aware of an issue threatening the public health and welfare, appointed a River Activities Committee to devise possible solutions, and implemented some of the suggested solutions.[3] *STOP v. City of New Braunfels*, 306 S.W. 3d 919, 923 (Tex. App.—Austin 2010). This is local government working at its best and exemplifies why courts will not interfere with a local regulation absent a "clear abuse of municipal discretion." *See Comeau*, 633 S.W. 2d at 792.

---

[3] After its passage by the City Council, the Disposable Container Ordinance was challenged via referendum and upheld by the voters, further demonstrating the importance of addressing the issues of trash on the river to the local residents. CR:545-49.

**E. The Ordinances are a valid exercise of the City's police powers over navigable waters and are not preempted by the Texas Constitution nor the Texas Parks and Wildlife Code.**

Appellees erroneously argue that the Ordinances unconstitutionally "invade the public's right to use and enjoy the rivers," because only the State and duly delegated entities have the right to regulate navigable streams. Appellees' Br. at 41 (*citing* Tex. Const. art. XVI, § 59 and Tex. Parks & Wild. Code § 1.011(c)). This argument fails because the Ordinances in no way invade constitutionally protected rights of the public and are a valid exercise of the City's police power through its inherent powers as a home-rule city and by virtue of the Texas Local Government Code.

It is not in dispute that navigable streams are held in trust for the public to use for "navigation, fishing, and other lawful purposes," and that the public has a right to use navigable streams for commercial as well as recreational purposes. *See Diversion Lake Club v. Heath*, 86 S.W. 2d 441, 444 (Tex. 1935); *Tex. River Barges*, 21 S.W. 3d at 352. However, the Ordinances do not run afoul of the Constitution or Parks and Wildlife Code because they do not interfere with the public's ability to access and navigate the Rivers.[4]

---

[4] Although *Diversion Lake Club* mentions "enjoyment of the river" one could argue that the Ordinances impair certain individuals' "enjoyment" of the river, it is clear from the context that "enjoy" means access to the river and exercise of the right to use it, rather than bring or do anything one subjectively might find enjoyable. To demonstrate the danger of using

The Ordinances do not prohibit the public from accessing the Rivers, but rather, make it unlawful "to use, carry, or possess food or beverages in a disposable container" on the Rivers. New Braunfels, Tex., Code ch. 86, art. I, § 86-14(1). The public's right to access and navigate rivers does not mean that anybody has free reign to bring anything into the river they desire, or that a City cannot exercise its police powers to restrain behavior that could diminish the public's safe enjoyment of the river. The right to use the waters is not without limits. "The fact that navigable streams are held in trust for the benefit of the public does not mean that the State or a duly-delegated governmental agency has no authority to restrict navigation on the same." *Guadalupe-Blanco River Auth. v. Pitonyak*, 84 S.W. 3d 326, 340 (Tex. App.— Corpus Christi 2002); *see also Diversion Lake Club*, 86 S.W. 2d at 445 (noting that right to fish in public water does not entail the right to cross or trespass upon privately owned land in order to reach the water). Indeed, the public's right to use the river for fishing and "other lawful purposes" suggests that governmental entities can and do make unlawful some uses of the river. And the fact that an activity has historically been lawful does not preclude governmental action making it unlawful, particularly when circumstances

"enjoy" subjectively, consider this: some might enjoy the river more with disposable containers, while others enjoy it significantly less without the prohibitions.

16

come to exist that demonstrate problems with that activity—e.g., over 1,400 pounds of trash collected from the Comal River after the 2011 Memorial Day Weekend.

Moreover, New Braunfels, as a home-rule city, has been delegated the police power, and it may exert the police power over the navigable waters within its boundaries. *See Tex. River Barges*, 21 S.W. 3d at 355; *see also Guadalupe-Blanco River Auth.*, 84 S.W. 3d at 340 ("[S]tates and their delegates may exert police power over the navigable waters in their boundaries..."). Appellees cite to no cases—and *amici* could find none—employing the Texas Constitution or the Texas Parks and Wildlife Code to limit the authority of cities to regulate use of waterways within their borders.

Although Appellees contend that only the State can regulate navigable waters, the cases cited by Appellees stand for the proposition that **private entities** cannot interfere with the public's access to navigate waterways. Appellees cite an 1863 case in support of its assertion that the City cannot regulate waterways, but that case is inapposite. *See* Appellees' Br. at 41 (citing *Selman v. Wolfe*, 27 Tex. 68 (1863)). There, the issue was whether the Legislature, in authorizing a private entity to erect a bridge, had also conferred the right to obstruct navigation of a stream. *Selman*, 27 Tex. at 70. Thus, the analysis centered on the stream as a state highway, and whether a

17

private entity could obstruct its use as a highway. *Id.*; *see Diversion Lake Club*, 86 S.W. 2d at 446 (holding public had right to fish in lake created by a dam, rather than exclusively belonging to owner of land that was flooded by dam); *Carrithers v. Terramar Beach Cmty. Imp. Ass'n, Inc.*, 645 S.W.2d 772, 774 (Tex. 1983) (holding that individual landowner is without power to convey an exclusive right to use navigable waters).[5] The case *Heard v. Town of Refugio* comes closer—but still falls short of supporting Appellees' point. *See* 103 S.W. 2d 728 (Tex. 1937). There, the issue was whether a town or individuals held title to a river bed located in adjoining tracts of land. *Id*. at 728-29. The court noted that among properties owned by cities and towns for public benefit, river beds were not one. *Id*. at 734. But nothing in this case suggests that the City needs to hold title to the river bed to regulate activities on the Rivers for public purposes.

More recently, a Texas court expressly upheld a city's authority to regulate activities on the river within its jurisdiction. In *Texas River Barges v. City of San Antonio*, the court upheld an ordinance regulating navigation on the San Antonio River. 21 S.W. 3d at 350. Acknowledging that this river is a

---

[5] The quote attributed to *Welder v. State* on page 42 of Appellees' Brief actually comes from the *Carrithers* case, which does not cite to *Welder*, 196 S.W. 868 (Tex. Civ. App.—Austin 1917, writ ref'd). Although the quoted excerpt discusses the water belonging to the Texas and United States governments, this sentence is immediately followed by "An individual landowner is without power to convey such a right," demonstrating that the juxtaposition was between sovereigns and private entities, not cities.

navigable stream which may be used and enjoyed by the public, the court nevertheless held that the City has authority to regulate navigation on the River to "prevent endangering the public and jeopardizing the River's distinctive and sedate character." *Id*. Thus, the court upheld San Antonio's ordinance requiring vessels to obtain the city's permission to operate on the river. *Id*. at 351. Although that ordinance expressly restricted navigation on and access to the waterway, the court upheld it as a proper exercise of the city's police power. The indisputably less restrictive Ordinances at issue here should likewise be upheld as a valid exercise of the City's police power.

### F. Texas Local Government Code § 551.002 provides further support that the Ordinances are a valid exercise of the City's police power.

To the extent that home-rule cities are limited in their power to regulate navigable streams, state statute expressly grants the City authority to enact the Ordinances here. Section 551.002 of the Local Government Code provides that "a home-rule municipality may prohibit the pollution or degradation of and may police a stream... that may constitute or recharge the source of water supply of any municipality." Evidence in the record shows that the Guadalupe and Comal Rivers are part of the Middle Guadalupe River Watershed, which constitutes and recharges the water supply of several municipalities. CR:936; 938. Thus, the City has authority to enact ordinances to decrease pollution

19

and degradation of this resource. Appellees' strained interpretation of §

551.002 is absurd. *See* Appellees' Br. at 40. Appellees argue that, because

Texas Health and Safe Code § 361.0961 prohibits municipalities from

regulating the use of disposable containers, in enacting § 551.002, the

Legislature must have anticipated forms of pollution and policing a stream

other than litter. *Id*. As support, Appellees point to the Texas Litter Abatement

Act, which criminalizes littering in Texas rivers, and contend that if § 551.002

were to address litter it would be redundant with this Act. *Id*. But that is

simply not true. Section 551.002 does not make littering in rivers a crime; it

merely authorizes cities to take action to protect streams; thus the statutes do

not serve the same purpose and are not redundant.[6]

Moreover, if the legislature intended to exclude litter from the kind of

pollution a city could police under § 551.002, it could have made that

exception clear by defining "pollution" in the statute at issue. It did not. The

legislation does not address the fact pattern present here—there is nothing to

indicate that the legislature actually thought about the issue of too many

beverage containers in rivers running through municipalities. Thus, the

---

[6] Further, under Appellees' interpretation of § 551.002—that it is intended for cities to
address water pollution other than litter—this provision may be redundant with Water
Code § 26.177, which provides that "a city may establish a water pollution control and
abatement program for the city," and regulations adopted under this section address the
type of "non-litter pollution" that Appellees argue is the subject of § 551.002.

20

Legislature did not express an "unmistakably clear" intent to preempt the City's power to enact ordinances designed to reduce pollution in rivers within City limits. Rather, there is a reasonable construction giving effect to both the state statute and the City's ordinances, and the ordinances are not preempted. *See City of Houston v. Bates*, 406 S.W. 3d at 546. This construction also gives appropriate deference to the broad discretionary powers the Texas Constitution grants to home-rule cities. *See In re Sanchez*, 81 S.W. 3d 794, 798 (Tex. 2002).

In sum, the City has both the inherent home-rule authority to police navigable streams in its boundaries and the water-protection powers granted by the Local Government Code. Those powers support the public health and safety Ordinances challenged in this case. Appellees cannot point to any superior state law that displaces these ordinances with "unmistakable clarity." The unmistakably clarity in this case is found in the waters of the Comal River.

## IV. CONCLUSION

As a home-rule city, New Braunfels has the inherent authority to enact reasonable regulations that promote the public welfare and are not contrary to the constitution or laws of the State. The Ordinances bear a substantial relationship to the public health, safety, and general welfare, and are thus a reasonable exercise of the City's authority. Appellees failed to carry their

21

substantial burden of establishing that the Ordinances are invalid.

Accordingly, *amici* respectfully request that this Court reverse the decision of

the trial court and reinstate the Ordinances.

Respectfully submitted,

/s/ Bill Bunch
Bill Bunch
State Bar No. 03342520
bill@sosalliance.org
/s/ Kelly D. Davis
Kelly D. Davis
State Bar No. 24069578
kelly@sosalliance.org
Save Our Springs Alliance
905 W. Oltorf St., Ste. A
Austin, Texas 78704
T: (512) 477-2320
F: (512) 477-6410

**Attorneys for *Amici Curiae***

## CERTIFICATE OF COMPLIANCE

This brief complies with the maximum length limit set forth in Tex. R. App. P. 9.4(i)(2) because it contains 4,980 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4(i)(1). The word count was computed by Microsoft Word, which was used to prepare the document.

/s/Kelly D. Davis
Kelly D. Davis

## CERTIFICATE OF SERVICE

I certify that, on March 3, 2015, a copy of the foregoing *Brief of Amici Curiae in Support of Appellant* was served electronically via FileTime on the following counsel of record:

Jim Ewbank
Cokinos, Bosien & Young
1210 Nueces St
Austin, TX 78701

Jonathan H. Hull
Reagan Burrus, PLLC
401 Main Plaza, Ste. 200
New Braunfels, TX 78130

**Attorneys for Appellees**

William M. McKamie
Adolfo Ruiz
McKamie Krueger LLP
941 Proton
San Antonio, TX 78258

Bradford E. Bullock
Knight & Partners
223 W. Anderson Lane, Ste. A-105
Austin, TX 78752

**Attorneys for Appellant**

/s/Kelly D. Davis
Kelly D. Davis

# Exhibit A

Affidavit of Michael Mundell, Manager of the Solid Waste Division, Public Works Department, City of New Braunfels

Originally attached to *Defendant's Response to Plaintiffs' Motion for Entry of Final Judgment, and for an Order that the Judgment Not Be Superseded by Appeal, and for Attorney's Fees* (filed Feb. 7, 2014, Comal Cnty. District Court)

## AFFIDAVIT OF MICHAEL MUNDELL

STATE OF TEXAS '

'

COUNTY OF COMAL '

My name is Michael "Mike" Mundell. I am over 21 years of age, of sound mind and capable of making this affidavit. I am currently the Manager for the Solid Waste Division of the Public Works Department for the City of New Braunfels and I am responsible for managing the solid waste division of the City's Public Works Department. I have been in my current position since August 2010. I have personal knowledge of the facts stated herein, and they are true and correct.

As the Manager of the Solid Waste Division, I am responsible for overseeing the City of New Braunfels's efforts regarding the Comal River cleanup practices. As part of my responsibility, I am familiar with the amount of trash and litter that is collected and accounted for above the water in public areas alongside the Comal River and under the water in the Comal River. Since the enactment of the Disposal Container Ordinance which was effective January 1, 2012, the City has experienced a significant reduction in the amount of trash and litter that was collected and accounted for the years 2012 and 2013 in comparison to year 2011. The total estimated trash and litter for above and below water in the Comal River for 2011 is approximately 97 tons. The total estimate for trash and litter for above and below water in the Comal River for 2012 was approximately 24 tons which was 75% less than the 2011 amount. The total estimate for trash and liter for above and below water in the Comal River for 2013 was approximately 34 tons which was 65% less than the 2011 amount.

Further affiant sayeth not.

_____
Michael Mundell, Solid Waste Manager for
The City of New Braunfels, Texas

SWORN TO and SUBSCRIBED BEFORE ME on February 5, 2014.

_____
NOTARY PUBLIC, In and For the State of Texas

C. WILKE
Notary Public, State of Texas
My Commission Expires
August 06, 2015

# Exhibit B

Greg Bowen, *Holiday Garbage up 438 Percent,* NEW BRAUNFELS HERALD-ZEITUNG, July 2, 2014

# Holiday garbage up 438 percent

**By Greg Bowen New Braunfels Herald-Zeitung | Posted: Wednesday, July 2, 2014 10:52 pm**

A report released Wednesday by the City of New Braunfels indicates that the amount of river litter left behind by tubers increased greatly this past Memorial Day Weekend when compared to the same weekends in the "can ban" summers of 2013 and 2012.

River trash was up by 438 percent over 2013 and by 356 percent over 2012, according to figures from the city's River Services Update.

The can ban, or disposable container ban, was approved by New Braunfels City Council and by city voters following the "River Wild" summer of 2011. The anti-litter law prohibited tubers from carrying beer cans and other throw-away food and beverage containers on portions of the Comal and Guadalupe Rivers within the city limits.

Following a lawsuit by local tubing and tourism firms, the prohibition was set aside in March by a judge who declared the can ban unconstitutional and ordered the city to stop enforcing it. The city is currently appealing the ruling to the Third Court of Appeals in Austin.

The River Services Update — the latest report available on river litter collections — said the city's contract scuba divers removed 242 pounds of river litter during this year's Memorial Day Weekend, which unofficially kicked off the summer tubing season.

That compares to just 45 pounds collected for the Memorial Day Weekend in 2013, the second summer of the can ban.

That same weekend in 2012, the first summer of the can ban, 53 pounds of river trash were scuba'd up.

**Non-ban years compared**

The report also showed that while this year's Memorial Day Weekend river trash haul was way above the litter totals experienced during the can ban years, it was nowhere near the trash haul seen in the pre-can ban summer of 2011.

On the Memorial Day Weekend in 2011, according to the report, 1,421 pounds of river trash were collected — 487 percent more than seen during this year's Memorial Day Weekend.

That disparity may be attributable at least in part to the fact that Memorial Day Weekend 2014 was somewhat rainy while crowd-control measures had to be implemented during Memorial Day Weekend 2011, which kicked off the infamous "River Wild" summer during which tens of thousands of tubers descended on the city and there were drownings, hundreds of river-related arrests for such things as public intoxication, DUI, littering, marijuana possession, jumping from bridges and noise violations.

"Perhaps weather and crowd-size comparisons between Memorial Day Weekend 2011 and 2014 were a factor," speculated Sheri Masterson, the city's public information officer, who added that the "massive public education campaign mounted to bring attention to good stewardship of our natural resources over the past several years" may also have played a part.

# Exhibit C

Asher Price, *Researchers Find Carcinogen Dropoff in Lady Bird Lake Following Ban*, AUSTIN AMERICAN-STATESMAN, June 16, 2014



**56°**
Overcast
H: 64°  L: 58°
Weather | Traffic

 Tuesday, March 3, 2015

Austin American-Statesman

Welcome to statesman.com

Hi,  PatBrodnax |  Sign Out

Search Site    🔍

HOME    METRO &      INVESTIGATIONS    BUSINESS    SPORTS    AUSTIN360/LIFE    OPINION    VIDEO    SHOPPING
        STATE

**STATE & REGIONAL GOVT & POLITICS**

 Texas Senate lays out controversial public education agenda

**WEATHER**

 FAA allows flights destined for Austin to resume

**LOCAL**

Video claims San Marcos city, police websites hacked

▼  LATEST HEADLINES  ▼

HOME   /   NEWS

# Researchers find carcinogen dropoff in Lady Bird Lake following ban

Resize text  A  |  A  |  A

Posted: 6:13 p.m. Monday, June 16, 2014

By Asher Price - American-Statesman Staff

A landmark 2006 prohibition of a type of pavement sealant ended an upward trend of a probable carcinogen in Lady Bird Lake, Austin-based federal scientists report.

The findings, published Monday in the journal Environmental Science and Technology, offer a measure of vindication for those selfsame scientists – researchers with the U.S. Geological Survey – and Austin officials who long battled industry interests that had fought the ban.


RODOLFO GONZALEZ

U.S. Geological Survey's Barbara Mahler and Peter Van Metre speak during a press conference held at Lou Neff Point on Lady ... Read More

Scientists examined sediment collected for Lady Bird Lake in three different decades and found the probable carcinogen, called polycyclic aromatic hydrocarbons, or PAHs, had declined by 58 percent since the ban, reversing a 40-year upward trend.

Lady Bird Lake was never dangerous for human recreation and remains below toxicity levels for aquatic life, the scientists and officials said



CAMP GUIDE 2015
presented by austin360.com

FIND THE PERFECT CAMP ▶

advertisement

**In this Section**

Video claims San Marcos city, police websites hacked

 Owner of world's biggest pit bull works to overcome breed stereotypes

Unlikely coalition pushes back against effort to scrap local bans

Chilly reception dooms Texas libel bill

Gun bill meets opposition in Texas Senate hearing

Monday.

But the upward trend had alarmed scientists and officials because it indicated, they said, that pockets of the city whose water drains into the lake had experienced higher PAH levels.

"The lake is our barometer," said Barbara Mahler, a USGS researcher who co-authored the paper.

Mahler and her co-author, Peter Van Metre, have been writing about PAHs since 2000 – and the makers of sealants have been fighting any tie to their products for nearly as long.

Sealants are used over asphalt in the construction of roads and parking lots to make them impervious to water and oxygen penetration. Coal-tar sealants, which do not absorb oil, often are used in gas stations and parking lots. Particles of the sealant can become dislodged in areas of heavy traffic and washed into waterways.

The coal-tar sealants contain high levels of PAHs compared with the kind without coal tar.

In 2003, Austin officials pointed to parking lot sealants as a likely source of the chemicals as the American-Statesman ran stories about pollution by the hydrocarbons in and around Barton Springs Pool.

Researchers concluded that, on average, coal tar-based sealants accounted for half of all polycyclic aromatic hydrocarbons in the lake, while tailpipe emissions accounted for about one-quarter.

In January 2006, the city became the first in the nation to ban the sealants. The following year, the ban survived a challenge from a maker of sealants at the state environmental agency.

But in 2008, sealant companies formed the Pavement Coatings Technology Council to beat back expansion of the ban to other communities.

In April, the trade association asked the EPA to end an endorsement of USGS findings, based largely on Mahler and Van Metre's work, that the sealants are the largest source of PAHs in urban lakes and toxic to aquatic life.

Mahler and Van Metre "have feelings of animosity toward industry," said Anne LeHuray, executive director of the trade association. "We think they think they're doing the righteous thing – they're trying to science it up, but the science doesn't hold water."

In response, Van Metre said: "We are scientists working for the U.S. Geological Survey. Our mission is to do unbiased work for decision-makers and the public. All the other research not funded by industry confirm that these products are a potent source of contamination."

Bastrop sheriff: Arrest in Samantha Dean case likely not soon

Bastrop Co. sheriff: Arrest in Samantha Dean shooting likely not soon

Amplify Austin rescinds action that led to exit of faith-based groups

Former Texas Land Commissioner Bob Armstrong dies

Kent Finlay, music venue owner and songwriters' mentor, dies at 77

Now roughly 16 million Americans live in communities that have banned coal-tar sealants, according to Tom Ennis, who runs the blog Coal Tar Free America. The states of Washington and Minnesota; Washington D.C.; a handful of cities and several counties around the country have some sort of ban, according to the blog.

The USGS researchers said activities in waterways are safe because the hydrocarbons tend to settle into sediment at the bottom of waterways and are in such small concentrations as to pose little risk to human health.

"Lady Bird Lake is safe to swim in, but it's not safe to smear yourself in sediment," Mayor Lee Leffingwell said. "It was on a trajectory for it to be unsafe. We reversed that trend."

Although hydrocarbons can cause tumors in fish, the fish metabolize the chemical so it doesn't make its way up the food chain.

"We've gotten push-back from industry," U.S. Rep. Lloyd Doggett, D-Austin, said about his efforts to expand the Austin ban nationally. But the new findings "are the latest indication that the rest of the country should do something to solve this."

---

Major milestones in ban:

**2003:** Following stories in the American-Statesman about pollution in and around Barton Springs Pool, city officials point to parking lot sealants as a likely source of the chemicals, called polycyclic aromatic hydrocarbons, or PAHs.

**2006:** Starting Jan. 1, following investigations by Austin's Watershed Protection Department and the U.S. Geological Survey, Austin bans coal-tar sealants.

**2007:** Texas-based GemSeal Inc., a maker of pavement and tennis court sealants, tries and fails to get the Texas Commission on Environmental Quality to overturn the ban, which it said was based on faulty science.

**2010:** A report by the Austin-based researchers found that coal tar-based pavement sealants are the largest source of PAHs found in urban waterways nationwide.

**2014:** The researchers report that PAHs in Lady Bird Lake had declined by 58 percent since the ban.

PREVIOUS: **OPINION**

**Alam: Texas should reverse course on Sov...**

By Dr. Imtiaz Alam - Special to the American-Statesman

NEXT: **CRIME & LAW**

**Blotter: Truck driver killed in Temple afte...**

By Staff - American-Statesman staff